# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**CYNTHIA BALLENGER, and**<br>**CHRISTOPHER PRICE,**<br><br>**Defendants.** | **Case No. 1:21-cr-00719 (JEB)** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE

Dated: July 22, 2022

Respectfully submitted,

/s/ Nandan Kenkeremath

Nandan Kenkeremath
DC Bar 384732
2707 Fairview Court
Alexandria, Virginia 22311
703-407-9407
Email: nandank@comcast.net

*Counsel for Defendants*

**ARGUMENT**

Both the Fifth and Sixth Amendments secure the right to trial by an impartial jury. Const. amends. V, VI; *see also Skilling v. United States*, 561 U.S. 358, 378 (2010). The Sixth Amendment guarantees an "impartial jury" only to defendants, not to the government. The presumption is innocence.  The burden is with the prosecution and the standard is beyond a reasonable doubt.  Any indication that these burdens will not form the basis of the judicial process, including from a jury is a violation of the Price's Fifth and Sixth Amendment rights.

The dramatic amount of pre-trial publicity and public statements has grown substantially since this Court has ruled on similar change of venue motions. Moreover, as discussed further below, the government has specifically pursued guilt by association and collective responsibility theories as the basis for its prosecution of the same four charges that the Prices face.

Below is an analysis, in part, under *Skilling*. However, no case prior to the January 6th cases reflects the highly unusual circumstances of pre-trial publicity, partisanship, and the repeated and emotionally charged statements, from so many sources, over such an extended period of time.   The mode and nature of pre-trial publicity has changed substantially since *United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976).  Moreover, "[e]ach case must turn on its special facts." *Marshall v. United States* 360 U.S. 310, 312 (1959).  In *Marshall,* the Court looked at publicity during the trial but made important points about the supervisory role of the courts:

> The trial judge has a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. [citing *Holt* v. *United States*, 218 U.S. 245 (1910)]. Generalizations beyond that statement are not profitable, because each

case must turn on its special facts. We have here the exposure of jurors to information of

a character which the trial judge ruled was so prejudicial it could not be directly offered

as evidence. The prejudice to the defendant is almost certain to be as great when that

evidence reaches the jury through news accounts as when it is a part of the prosecution's

evidence. Cf. *Michelson* v. *United States*, 335 U.S. 469, 475 [(1948) date added]. It may

indeed be greater for it is then not tempered by protective procedures. *Id*. at 312 and 313.

The federal courts can, of course, establish more rigorous standards for their own governance

than those minimum guarantees of fairness imposed on the state courts by the Constitution. *See,*

*e. g., Ristaino v. Ross,* 424 U.S. 589, 597 nn. 9-10 (1976); *Murphy v. Florida*, 421 U.S. 794, 797-

798 (1975); *id.* at 804, (Burger, C. J., concurring); *cf. United States v. Williams,* 523 F.2d 1203,

1209 n. 11 (5th Cir. 1975).

The Court should consider every avenue to preserve the rights of the Fifth and Sixth

amendment including change of venue, change of venire, extra voir dire, and possible

continuance.

I. **The Amount of Pre-Trial Publicity Imputing Collective Guilt and Providing**
   **Prejudicial Characterizations in the Instant Case Is Massive and Unprecedented**

The events in Washington DC of January 6, 2021, are among the most partisan legal,

political and public situations in America. Democrats and the media have repeatedly drilled

numerous concepts concerning January 6, 2021 into the conscious of the American public.  As

discussed below, these concepts include repeated generalized allegations of 1) the violent mob;

2) white supremacy; 3) terrorism; 4) insurrection; and 5) deaths purportedly connected to

January 6, 2021.  This is beyond any distortion or pre-trial publicity related to Watergate cases

from the seventies. These generalized themes would be presumably barred at trial as being

2

irrelevant, however, the presentation of these narratives outside of the trial creates presumptions that will, nevertheless, impermissibly invade the courtroom.

### A. The Impeachment and Impeachment Trial Had Substantial Coverage

President Trump was impeached by the House of Representatives on January 13, 2021, by a vote of 232 to 197 for incitement of insurrection.  Ten House Republicans supported impeachment. However, the vote was, otherwise, along partisan lines. The Senate acquitted President Trump on February 13, 2021, with all Democrats and the 2 Independents votinged guilty.  Among Republicans 43 voted not guilty and 7 voted guilty.  The House impeachment and impeachment trial was, of course, the subject of substantial news coverage.

Among other items, article i: incitement of insurrection states:

Thus incited by President Trump, members of the crowd he had addressed, in an attempt to, among other objectives, interfere with the Joint Session's solemn constitutional duty to certify the results of the 2020 Presidential election, unlawfully breached and vandalized the Capitol, injured and killed law enforcement personnel, menaced Members of Congress, the Vice President, and Congressional personnel, and engaged in other violent, deadly, destructive, and seditious acts. *See* https://www.govinfo.gov/content/pkg/CREC-2021-01-13/html/CREC-2021-01-13-pt1-PgH165.htm .

### B. Biden Statements at Important Recent Events

While signing an executive order on racial equality President Biden stated "It's just been weeks since all of America witnessed a group of thugs, insurrectionists, political extremists, and white supremacists violently attack the Capitol of our democracy."  *See Remarks by President Biden at Signing of an Executive Order on Racial Equity*, The White House (2021),

3

https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/01/26/remarks-by-president-biden-at-signing-of-an-executive-order-on-racial-equity/.

President Biden also made comments about January 6, 2021, at an event commemorating the 10-year anniversary of the Martin Luther King Jr. memorial in Washington stating that "The violent, deadly insurrection on the Capitol nine months ago, it was about white supremacy, in my opinion." *See* https://www.bloomberg.com/news/articles/2021-10-21/biden-says-white-supremacy-motivated-trump-s-jan-6-rioters. According to the same report, President Biden also mentioned the white supremacist rally in Charlottesville, Virginia, in 2017, saying: "The through line is that hate never goes away."

President Biden also made inflammatory comments recently this year while addressing the nation on January 6, 2022 from the National Statuary Hall (*See* https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/01/06/remarks-by-president-biden-to-mark-one-year-since-the-january-6th-deadly-assault-on-the-u-s-capitol/):

Well, here is the God's truth about January 6th, 2021:

Close your eyes.  Go back to that day.  What do you see? Rioters rampaging, waving for the first time inside this Capitol a Confederate flag that symbolized the cause to destroy America, to rip us apart. Even during the Civil War, that never, ever happened.  But it happened here in 2021. What else do you see?  A mob breaking windows, kicking in doors, breaching the Capitol.  American flags on poles being used as weapons, as spears.  Fire extinguishers being thrown at the heads of police officers.

A crowd that professes their love for law enforcement assaulted those police officers, dragged them, sprayed them, stomped on them.

Over 140 police officers were injured. We've all heard the police officers who were there

4

that day testify to what happened.  One officer called it, quote, a med- — "medieval"

battle, and that he was more afraid that day than he was fighting the war in Iraq.

….Rioters menaced these halls, threatening the life of the Speaker of the House, literally

erecting gallows to hang the Vice President of the United States of America…..

This wasn't a group of tourists.  This was an armed insurrection….

### C.  Vice President Harris Interview Comparing January 6th to Pearl Harbor and 911

The current Vice President of the United States has also contributed to the negative pre-

trial publicity in these cases.  Below are excerpts from her interview with the media about

January 6, 2021:

> Well, I mean, it was the same thing that went through my mind when I saw
>
> Charlottesville. I mean, it's the same thing that went through my mind when I saw a
>
> picture of Emmett Till. Sadly, it is not the first time I have seen a demonstration like
>
> what you are describing in the history of our country.…
>
> 'Certain dates echo throughout history, including dates that instantly remind all who
>
> have lived through them where they were and what they were doing, when our
>
> democracy came under assault,' Harris began. 'December 7, 1941, September 11,
>
> 2001 and January 6, 2021.' See https://www.dailymail.co.uk/news/article-
>
> 10375423/Kamala-Harris-compares-January-6-Pearl-Harbor-9-11-criticizes-
>
> extremists.html

### D.  The President of NAACP Claimed White Supremacy Invaded the Capitol

Leaders of important civil rights organizations have also contributed to the generalization of all January 6 defendants being "insurrectionists." Derrick Johnson, President and CEO of the NAACP penned an op-ed printed in USA today on January 6, 2022 claiming:

> White supremacy invaded our Capitol on Jan. 6. It continued to invade our lives through every television news and social media feed that replayed horrifying clips of insurrectionists flooding the halls of democracy.  Now, white supremacy is brazenly re-invading our constitutional right to vote. *See*
>
> https://www.usatoday.com/story/opinion/2022/01/06/naacp-white-supremacy-january-6/9092954002/

### E.  *Congressional Black Caucus Hearing Claiming White Supremacy*

On January 13, 2021 The Congressional Black Caucus held a virtual hearing on the events of January 6, 2021 titled "U.S. Capitol Insurrection: White Supremacy on Display."  *See*

https://www.c-span.org/video/?507965-1/congressional-black-caucus-hearing-us-capitol-attack

The Chairwoman of the Congressional Black Caucus stated: "This was a domestic terror attach perpetrated by rioting mobs of white supremacists, armed, equipped in many skilled and police tactics who came to overturn an election in which their candidate Trump lost."

### F.  *Highly Prejudicial Public Testimony at the Select Committee Hearing*

Notably, the House Select Committee features Liz Cheney and Adam Kinzinger, two of the Republicans that voted for impeachment.   Claims of racism from the mob in various incidents were a significant part of the July 21, 2021, proceeding. *See*

https://apnews.com/article/joe-biden-government-and-politics-riots-race-and-ethnicity-capitol-siege-b3eb4a7f1a0d183c9db89a08c84a70cb

In the recent June 9, 2022 hearing of the Select Committee investigating the events of January 6th, Chairman Bennie Thompson started his opening statement with the following:

I'm from a part of the country where people justify the actions of slavery, the Klu Klux Klan, and lynching.  I'm reminded of that dark history as I hear voices today try and justify the actions of the insurrectionists on January 6th, 2021. *See* https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript

The prime-time broadcast has included emotional and sensational material.  For example, Police Officer Caroline Edwards said she saw officers with "blood all over their faces" and was "slipping in people's blood." *See* https://www.nbcnews.com/video/capitol-police-officer-injured-in-jan-6-riot-says-she-was-slipping-in-people-s-blood-141829189901.

Select Committee activities continue, generally nationally televised, and portions discussed on National and local news and on social media.  These activities will continue over the next months and campaign activity highlight January 6th issues are likely.

### G.  Senate Majority Leader Schumer Tying January 6th To Race Issues

Majority Leader Schumer stated:

And I saw something that I had been told later never happened before, the Confederate flag flying in this dear Capitol. That's just one of many searing, grotesque images of that unimaginable, most un-American day….

7

Just as the Big Lie inspired the attack of January 6th, the Big Lie continues …

we're seeing the most restrictive voter suppression efforts since Jim Crow. Since

Jim Crow – in 21st century America, turning the clock way back. *See*

https://www.democrats.senate.gov/news/press-releases/majority-leader-schumer-

floor-remarks-on-the-first-anniversary-of-the-january-6th-insurrection-of-the-us-

capitol

## H. *The Speaker of the House, Nancy Pelosi, Calls Out A Terrorist Mob*

"The violent domestic attack on Congress on January 6th was the worst assault on the

Capitol since the War of 1812 and the worst domestic assault on American

Democracy since the Civil War…..The Select Committee on the January 6th

Insurrection will investigate and report upon the facts and causes of the terrorist mob

attack ….I must reject the recommendations of Representatives Banks and Jordan to

the Select Committee…..The unprecedented nature of January 6th demands this

unprecedented decision." *See* https://www.speaker.gov/newsroom/72121-2

## II. <u>Local Politicians and Other Local Statements Have Greatly Contributed to Prejudicial Publicity Imputing Collective Guilt and Providing Prejudicial Characterizations</u>

### A. *The Local NFL Franchise Coach and Organization Stating Organization "Will Not Tolerate Any Equivalency Between Those Who Demanded Justice in the Wake of George Floyd's Murder and the Actions of Those on January 6 Who Sought to Topple the Government"*

On June 10, 2022, one day after the first nationally broadcast select committee hearing, Ron Rivera, head coach for the Washington D.C. NFL franchise, Washington Commanders, fined Defensive Coach Jack Del Rio $100,000 for comments related to the events of January 6, 2021.  Mr. Del Rio stated earlier in the week that the events of January 6, 2021 was a "dustup" and compared that day to "riots, looting, burning" during protests in the summer of 2020.

Rivera said:

"[Coach Del Rio's] comments do not reflect the organization's views and are extremely hurtful to our great community in the DMV. As we saw last night in the [Congressional] hearings, what happened on the Capitol on Jan. 6, 2021, was an act of domestic terrorism. A group of citizens attempted to overturn the results of a free and fair election, and as a result, lives were lost and the Capitol building was damaged….words have consequences and his words hurt a lot of people in our community.  I want to make clear that our organization will not tolerate any equivalency between those who demanded justice in the wake of George Floyd's murder and the actions of those on January 6 who sought to topple our government." (emphasis added) *See* https://www.si.com/nfl/2022/06/10/commanders-announce-fine-jack-del-rio-ron-rivera-january-6-comments

**B. The Lawsuit by the District of Columbia**

The District of Columbia filed a lawsuit against Proud Boys International and Oath keepers "for conspiring to terrorize the District" in connection with the January 6 events at the Capitol.  *See District of Columbia v Proud Boys International, L.L.C. et. al.* (Case No. 1:21-cv-

03267). The Amended Complaint includes individuals and a category called John and Jane Does 1-50.  The District expressly excludes from John and Jane Does 1-50 any citizens of the District. DC Attorney General Karl Racine, who announced the civil lawsuit outside the House entrance, said the District seeks to impose severe financial penalties on those who caused the District to "deploy unprecedented resources to repel and defeat an attack on our country's capital." *See* https://rollcall.com/2021/12/14/d-c-files-lawsuit-against-two-groups-for-costs-of-jan-6-response/

### C.  Statements of DC Mayor Muriel Bowser

At the Congressional Black Caucus hearing of January 13, 2021, Muriel Bowser, Mayor of the District of Columbia stated:

> ….It is not lost on me, as we heard in president's comments who stoked the flames of this extremism and on January 6th encouraged the acts of terrorism and sedition that we saw, that resulted in the deaths of two United States Capitol Police Officers and Four Others…. This is not the end, this is the beginning of us needing as a country to be focused on radicalization of mostly white men who we saw in the Capitol that Day… *See* https://www.c-span.org/video/?507965-1/congressional-black-caucus-hearing-us-capitol-attack

### D.  Statements of DC Delegate Eleanor Holmes Norton

Delegate Eleanor Holmes Norton, non-voting Delegate from DC, said "It is appropriate that the perpetrators of the attack compensate D.C. for the other costs D.C. incurred that day." *See* https://rollcall.com/2021/12/14/d-c-files-lawsuit-against-two-groups-for-costs-of-jan-6-response/ . Delegate Norton also stated:

….The attack was not only an attack on democracy; it was also an attack on the District of Columbia.  The D.C. police department, which is paid for by D.C. residents, who are denied voting representation in the House and Senate and full self-government, moved voluntarily to save the lives of members of Congress and congressional staff, the Capitol and democracy itself.  Yet, House Republicans thanked D.C. by voting against the D.C. statehood bill only a few months after the attack.

The Capitol attack focused the world on the lack of local autonomy for the residents of the capital of the United States. *See* https://norton.house.gov/media-center/press-releases/norton-s-january-6th-vigil-remarks-focused-on-dc-statehood

### E.   Alleged Statements of the U.S. District Court Judges for the District of Columbia

As noted in a CNN article, the chief judge of the federal court in Washington DC emphasized the *local* nature of the damage:

> We're still living here in Washington, DC, with the consequences of the violence that this defendant is alleged to have participated in," she said. "Just outside this courthouse… are visible reminders of the January 6 riot and assault on the Capitol. *See* https://www.cnn.com/2021/01/28/politics/capitol-beryl-howell-richard-barnett-pelosi/index.html

Chief Judge Howell is reported to say:

> They were not merely disorderly, as countless videos show the mob that attacked the Capitol was violent.  Everyone participating in the mob contributed to that violence. See*'Almost Schizophrenic': Judge Rips DOJ Approach to Jan. 6 Prosecutions*, Politico

11

(Oct. 28, 2021) (emphasis added). *See* https://www.politico.com/news/2021/10/28/almost-schizophrenic-judge-rips-doj-approach-to-jan-6-prosecutions-517442

Chief Judge Howell may also be publicly concerned with the state of the political discussion.  It is reported that:

> Chief Judge Howell stressed that the attack on the Capitol was not "legitimate political discourse," saying that it "bears repeating" since a "major political party" believed it…. Chief Judge Howell asked if the government accepted "some responsibility" for "helping to foster some confusion about whether what occurred on Jan. 6 was a protest or legitimate political discourse" by letting defendants plead to the parading charge. *See* https://www.buzzfeednews.com/article/zoetillman/january6-doj-trump-rnc-plea-deals

U.S. District Judge Thomas Hogan appears to have compared the January 6th events to a lynch mob:

> During a sentencing hearing for Kenneth Reda on Wednesday, Senior U.S. District Judge Thomas Hogan said the psychology of the Donald Trump supporters who overran police and stormed the Capitol on Jan. 6 reminded him of "lynchings hundreds of years ago." *See* https://lawandcrime.com/u-s-capitol-breach/federal-judge-compares-jan-6-riot-to-lynch-mob-they-regret-it-afterwards-but-they-joined-in-it/.

It was also reported that U.S. District Court Judge Royce Lamberth was responding to members of Congress:

> "I'm especially troubled by the accounts of some members of Congress that Jan. 6 was just a day of tourists walking through the Capitol," U.S. District Judge Royce Lamberth said during a court hearing in Washington. "I don't know what planet

these people are on."…. "The attempt by some congressmen to rewrite history and

say this was all just tourists walking through the Capitol is just utter nonsense,"

Lamberth said. *See* https://www.usnews.com/news/top-news/articles/2021-06-

23/what-planet-are-they-on-judge-blasts-republicans-for-downplaying-attack-on-

us-capitol.

The reporting implied that Judge Lamberth was responding to the reporting of a statement of

Republican Representative Andrew Clyde who was reported to state:

"Watching the TV footage of those who entered the Capitol and walked through

Statuary Hall showed people in an orderly fashion staying between the stanchions

and ropes, taking videos and pictures," Clyde said. "If you didn't know the TV

footage was a video from January the 6th, you would actually think it was a

normal tourist visit." *Id.*

CNN also reported on statements of U.S. District Judge Randolph Moss:

"It means that it will be harder today than it was seven months ago for the United

States and our diplomats to convince other nations to pursue democracy. It means

that it will be harder for all of us to convince our children and our grandchildren

that democracy stands as the immutable foundation of this nation. It means that

we are now all fearful about the next attack in a way that we never were," Moss

said. *See* https://lite.cnn.com/en/article/h_31b637faf602c63056995f01ea19baba

**F. Area Democrat Senators and Representatives Contribute to the Negative Pre-trial**
   ***Publicity***

13

Local Senators and Representatives—all from the Democratic Party—have made

substantial statements with claims about January 6, 2021. A public statement from Democratic

Senator Tim Kaine provides, in part:

> "… a violent mob attempted to overturn the presidential election results and rob the
>
> American people of their duly elected leaders….Trump, right-wing insurrectionists
>
> stormed the U.S. Capitol …The insurrection led to the tragic loss of multiple heroic law
>
> enforcement officers from Virginia, and my heart is with their loved ones on this
>
> anniversary. https://www.kaine.senate.gov/press-releases/kaine-statement-ahead-of-
>
> january-6-anniversary

A public statement from Democratic Senator John Warner provides, in part:

> "…a violent mob stormed and desecrated the U.S. Capitol in an effort to rob the
>
> American people of the sacred right to elect their President. Despite these insidious
>
> efforts, democracy prevailed due to the brave actions of the Capitol Police, Metropolitan
>
> Police, Virginia State Police, Maryland State Police, and members of the National
>
> Guard who put themselves in peril, saving many lives and in some cases, losing their
>
> own…." *See*
>
> https://www.warner.senate.gov/public/index.cfm/pressreleases?id=B4F94BD9-0BA5-
>
> 48B6-9AF3-D5D0698197CB

A public statement from Democrat Maryland Senator Ben Cardin provides, in part:

> Men and women died on that day and shortly after because of what happened at the U.S.
>
> Capitol. Police officers were brutally attacked. A mob went hunting through the hallways
>
> for Vice President Mike Pence, Speaker Nancy Pelosi and others. *See*
>
> https://www.cardin.senate.gov/letters/not-pretty-but-important/

14

A public statement from Democrat Maryland Senator Chris Van Hollen provides, in part:

> "The violent mob unleashed by Donald Trump a year ago stormed and sacked this
> Capitol. Insurrectionists scaled the ramparts, tore through the barricades, and breached
> this building. They used flagpoles to beat Officer Michael Fanone and used chemical
> spray to assault Officer Brian Sicknick – who tragically died the next day. A gallows was
> built outside of this Capitol while rioters chanted, "Hang Mike Pence." …. *See*
> https://www.vanhollen.senate.gov/news/press-releases/van-hollen-delivers-floor-speech-
> on-anniversary-of-january-6th-insurrection

The public statement of Democrat Don Beyer Representing Closest Virginia District to DC,
provides, in part:

> "The crowd that attacked the Capitol included white supremacists and violent rightwing
> paramilitary groups. They constructed a gallows, and called for the assassination of the
> Vice President and the Speaker of the House….They failed because of the courageous
> actions of heroes in uniform, many of whom have not fully recovered from the significant
> injuries they suffered that day. Some of them lost their lives. Today we remember the
> pain and suffering inflicted on those who defended the Capitol…. We remember USCP
> Officers Brian Sicknick and Howie Liebengood and MPD Officers Jeffrey Smith, Kyle
> DeFreytag, and Gunther Hashida, and the anguish their families still feel." *See*
> https://beyer.house.gov/news/documentsingle.aspx?DocumentID=5417

A public statement of Democrat representative Abigail Spanberger representing Virginia District
Near DC, provides, in part:

"I was barricaded in the House Chamber on January 6. I was physically there as insurrectionists — domestic terrorists — clawed at the doors of the U.S House of Representatives. Those of us stranded in the gallery were among the final Members of Congress to be evacuated, and we watched as U.S. Capitol Police officers bravely fended off a violent attack. We furiously texted loved ones, we helped colleagues process this moment of crisis, we heard the cries of 'hang Mike Pence' outside the doors, and we prepared to deploy gasmasks….*See* https://spanberger.house.gov/posts/spanberger-statement-marking-one-year-since-january-6-2021

A public statement of Democrat Representative Anthony Brown representing a Maryland district bordering on D.C. provides, in part:

One year ago, our Capitol and our democracy were attacked by a violent mob of insurrectionists …. The January 6th insurrection resulted in the deaths of at least five Americans. *See*

https://anthonybrown.house.gov/news/documentsingle.aspx?DocumentID=1622

A public statement of Democrat Representative Jamie Raskin representing Maryland district bordering on D.C. provides, in part:

….. a savage mob riot of tens of thousands of people brought to Washington for…. The attempted coup and insurrection left 150 law enforcement officers injured, wounded, traumatized or dead. Anyone who denies or minimizes this unprecedented assault on law enforcement can never call himself or herself 'pro-law enforcement. *See* https://raskin.house.gov/2022/1/congressman-raskin-statement-on-the-one-year-anniversary-of-the-january-6th-insurrection;

III.   **The Government and Certain Statements of The Judiciary Have Emphasized Collective Guilt, And Broad Interpretation, Rather Than Specific Individual Conduct, Increasing the Problems of An Impartial Jury**

The government emphasizes the actions of others along with the mere presence of the Prices.  The Affidavit of the Special Agent Belcher (ECF 1, Attachment 1) attached to the initial charging document emphasizes:

> Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, shortly around 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts. Statement of Facts paragraph 5.

As discussed in the Price's memorandum supporting the Motion to Dismiss, there is no specific allegation that the Prices forced entry, broke anything, assaulted police officers, encouraged or assisted those acts or disobeyed a police officer in any way.

Statements of the judiciary appear to ratify this collective guilt approach, let alone protect against it. The recent opinion in *United States v. Rivera*, CRIMINAL ACTION 21-060 (CKK) (D.D.C. Jun. 17, 2022) is an example. The Opinion states: "[e]ven mere presence in an unlawful mob or riot is "disorder" in the sense that it furthers the mob's 'disturb[ing] the public peace'…." *Opinion* at 10.  The Opinion further states:

> As he joined the mob, he identified with those around him…. Clearly, the evidence shows, beyond a reasonable doubt, that Rivera took part in a "public manifestation" in furtherance of "some political or other cause." *Opinion* at 14.

17

Defendants, like the Prices, have not been charged with a group crime such as conspiracy and have also not been charged with Obstruction of an Official Proceeding.  Comments such as the ones demonstrated above and those publicly reported often ascribe guilt of more serious charges by virtue of references to groups and not to specific conduct under specific simple misdemeanors.  The Prices are further concerned about the use of the term "insurrection" which is an inflammatory and prejudicial statement.   Lastly, the statements of judges regarding January 6, 2021, make national news repeatedly. *See* https://www.cnn.com/2021/12/31/politics/judges-us-capitol-comments/index.html; https://www.lawfareblog.com/are-judges-showing-their-political-colors-jan-6-criminal-cases

## IV.    The Circumstances Involve Highly Partisan Bias

It is clear the that the basic view of the meaning of the events of January 6th at the Capitol vary by political affiliation.  A recent CBS News/YouGov poll illustrates this. (See https://www.cbsnews.com/news/january-6-opinion-poll-2022/).   The party affiliation table is this poll on what happened at the Capitol on January 6th, 2021 looks like this:

|  | DEMS | REPS |
|---|---|---|
| AN INSURRECTION | 85% | 21% |
| TRYING TO OVERTHROW GOV'T | 85% | 18% |
| PATRIOTISM | 12% | 47% |
| DEFENDING FREEDOM | 11% | 56% |

In a Pew Research Center survey conducted September 13-19, 2021, 77% of Republican or Lean Republican voters say that the Select Committee investigation will be "not too" or "not at all"

fair and reasonable. *See* https://www.pewresearch.org/fact-tank/2022/01/04/a-look-back-at-americans-reactions-to-the-jan-6-riot-at-the-u-s-capitol/.

Contrast this to Democrats or Lean Democrat where 63% find such House Commission will be very or somewhat fair and reasonable.  The same poll had a stark contrast regarding the statement that criminal penalties for the January 6th "rioters" were not severe enough.  Among the Democrat and Lean Democrat, combined, the figure was 71%. But among Republican/Lean Republican the figure was 19%.  A University of Massachusetts Amherst poll released April 27, 2021 showed a partisan divide in how Americans describe the participants on January 6th.  *See* https://www.umass.edu/news/article/republicans-blame-democrats-antifa-and-us. According to the poll, 68% of Democrats described them as "insurrectionists," "white nationalists," and "rioters."  Whereas 62% of Republicans called them "protesters."

**V.      A Study by the Public Defenders' Office Comparing the Jury Pools in the Washington D.C. Area Versus the Atlanta Area and Media Saturation Shows Much Stronger Negative Bias and Much Greater Media Saturation in the D.C. Area**

The Federal Public Defenders' Office for the District of Columbia commissioned Select Litigation, LLC of Washington D.C. to assess the federal jury pool in the District of Columbia (DC).  with respect to the activities arising out of January 6, 2021 citizens at the U.S. Capitol Building.  The jury survey attached was created by an expert hired by the Office of the Federal Public Defender as an effort to assess the federal jury pool in the District of Columbia.  The survey was first submitted with a Supplement to the Motion to Changed Venue filed in *U.S. v. Gieswein*, 21-cr-24 (EGS) (ECF 101 Attachment 1).

19

To that end, Select Litigation conducted two public opinion polls, one among jury-eligible citizens in DC and one among jury-eligible citizens of the Atlanta Division of the Northern District in Georgia.  Select Litigation also retained the services of a leasing media research firm, News Exposure, to analyze news coverage related to the events of January 6, 2021.  Below are some relevant entries into tables and discussion from the report.  Here, the information may be translated to different table formats. Paragraph 23 of the jury pool analysis includes among entries:

| Comparison of opinions among prospective jurors in DC and Atlanta Division | | | | |
|---|---|---|---|---|
| | | DC | GA | Difference |
| Opinion of whether people arrested for Jan 6 activities are guilty or not guilty of the charges brought against them | Guilty | **71%** | 54% | +17% |
| | Not Guilty | **3%** | 10% | -7% |
| | Volunteered (Depends) | **16%** | 19% | -3% |
| | Volunteered (Don't know/refused) | **10%** | 17% | -7% |

Paragraph 24 of the jury pool analysis finds opinions of January 6 defendants in very negative terms including the following "would" entries:

| Comparison of Beliefs about January 6 defendants in DC and Atlanta Division | | | | |
|---|---|---|---|---|
| Q.10. Would you or would you not describe most of the people who were arrested for their involvement in the events on January 6th at the U.S. Capitol building using this description? | | | | |
| | | DC | GA | Difference |

| Conspiracy Theorists | Would | **70%** | 52% | +18% |
| Criminals | Would | **62%** | 48% | +14% |
| White Supremacists | Would | **58%** | 40% | +18% |
| Member of a violent right-wing organization | Would | **54%** | 39% | +15% |

Paragraph 25 of the jury pool analysis again shows beliefs concerning the actions January 6th that characterize in very negative and prejudicial terms including the following entries:

**Comparison of Beliefs among January 6 defendants in DC & Atlanta Division, & Adults Nationwide**

Q.11. Do you believe this term would or would not describe actions on January 6? [footnote omitted]

| | | USA | DC | GA | Difference DC v USA | Difference DC v GA |
|---|---|---|---|---|---|---|
| Trying to overturn the election and keep Donald Trump in Power | Would | 63% | **84%** | 68% | +19% | +16% |
| | Would Not | 37% | **9%** | 19 | -28% | -10% |
| Insurrection | Would | 55% | **76%** | 55% | +21% | +21% |
| | Would Not | 45% | **13%** | 27% | -32% | -18% |
| Trying to overthrow the US. Government | Would | 54% | **72%** | 57% | +15% | +18% |
| | Would Not | 46% | **20%** | 33% | -26% | -13% |

The above selected information is just a subset of the points in the Select Litigation study that show important Fifth and Sixth Amendment problems.  First, there is tremendous prior opinion and pre-judgement at least about the context of the instant case and assumptions about those at the Capitol.  Second, D.C. is much worse on these points than either the national opinion comparison, where available, or the Atlanta division comparison.

The media analysis in the Select Litigation study showed Washington far exceeded Atlanta in totals from January 2021 through January 2022 in stories in the main newspapers (210 DC to 99 Atlanta); Web hits (33,347 DC to 8,112 Atlanta); and local broadcasts (7,300 DC to 4,005 Atlanta). See paragraphs 28, 29 and 31. The more recent ratios are worse. For example, the web hits for December 2022 are much larger for DC (1,873 DC to 389 Atlanta) and for January 2022 (1,951 DC to 507 Atlanta).

VI.    **A Transfer is Warranted Because the Of the Substantial Local Impact, the Partisan Divide, and Negative Prejudgment in the District of Columbia Is Higher Than Other States**

The importance of an impartial jury is fundamental to Due Process. Notwithstanding constitutional venue prescriptions, when prejudice makes it such that a defendant cannot obtain a fair and impartial trial in the indicting district, the district court *must* transfer the proceedings upon the defendants' motion. Fed. R. Crim. P. 21(a); *see also Skilling*, 561 U.S. at 378.

In some instances, the hostility of the venue community is so severe that it gives rise to a presumption of juror prejudice. *See Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (distinguishing between presumed venire bias and actual juror bias). As recently as 2010, the Supreme Court

reaffirmed the presumption approach articulated in *Patton* and identified three factors to guide the lower courts in determining whether a presumption should attach: (1) the size and characteristics of the jury pool; (2) the type of information included in the media coverage; and (3) the time period between the arrest and trial, as it relates to the attenuation of the media coverage. *Skilling*, 561 U.S. at 378.

Where it attaches, the Court has further recognized that the presumption of prejudice overrides juror declarations of impartiality during *voir dire* because such attestations may be insufficient to protect a defendants' rights in particularly charged cases. *Murphy v. Fla.*, 421 U.S. 794, 802 (1975) ("Even these indicia of impartiality might be disregarded in a case where the general atmosphere in the community or courtroom is sufficiently inflammatory."); *see also Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father."). Indeed, on appeal of a denial of a motion for change of venue, an appellate court need not even examine the *voir dire* record if it finds that the presumption attached. *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963) ("But we do not hesitate to hold, without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury, that due process of law in this case required a [transfer]."). Thus, under this precedent, *voir dire* is simply not a cure for significant and substantiated Due Process concerns about the jury pool. Each of those concerns is pressing in this case.

**A.** ***The Size and Characteristics of the District of Columbia Jury Pool Weigh in Favor of Finding a Presumption of Prejudice***

The foundation for the presumption of prejudice is found in *Rideau*. 373 U.S. at 727. In *Rideau*, the first factor that the Court weighed in favor of a finding of prejudice was that about half of the small jury pool had been exposed to prejudicial media reporting about the case. *See id*. Despite the fact that *voir dire* revealed that only three jurors had actually seen the broadcasts at issue, the Court found that the share of the pool that was tainted was significant enough as to render the defendant presumptively prejudiced. *See id*.

Because measuring the reach and impact of negative media reporting is difficult, in applying *Rideau*, many courts have focused on population size and diversity as a proxy for the share of the population that was likely impacted. For example, in *Skilling*, the Court observed that while the number of Enron victims in Houston was higher than that of other crimes, it was far from universal, and because Houston is the fourth-largest city in the United States, and is highly diverse, a significant number of prospective jurors would have had no connection to Enron whatsoever. *Skilling*, 561 U.S. at 358 ("[E]xtensive screening questionnaire and followup [sic] *voir dire* yielded jurors whose links to Enron were either nonexistent or attenuated.").

In contrast to Houston, the District of Columbia is one of the smaller major US cities, with a population under 700,000. (*See* https://dc.gov/release/2020-census-data-shows-dcs-population-growth-nearly-tripled-compared-previous-decade). And the impact of the events of January 6 on the residents of the District of Columbia were far more widespread than that of Enron in Houston, affecting a far greater share of residents than the conduct at issue in *Skilling*. First, as the Court is no doubt aware, a huge proportion of District of Columbia residents either work for the federal government themselves or have friends or family who do. Specifically, as of September 2017, the U.S. Office of Personnel Management reported that there are 600,000 federal civil workers and annuitants in the greater DC area (excluding postal workers, federal

bureau of investigation workers, and staff on several federal commissions). (*See Federal Civilian Employment*, OPM (Sept. 2017), https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/reports-publications/federal-civilian-employment/). Nearly 200,000 of those workers and annuitants are within the District itself. *Id*. With a total population of around 690,000, it seems clear that any given member of the District jury pool has a greater likelihood of being closely connected to the federal government than those in comparable metro areas. In fact, as of 2019, according to the DC Policy Center, *active* federal employment (including postal workers) accounts for nearly a third of all jobs in the District itself. *See Trends in Federal Employment in DC,* DC Policy Center (Mar. 28, 2019), https://www.dcpolicycenter.org/wp-content/uploads/3019/03/Fed-jobs-role-in-DC-economy.png.

And of course, for each federal worker, there are many friends and family members who are closely connected to the federal government by proxy. In particular, nearly 15,000 individuals work for Congress directly, and many more residents have friends and family who do. *See Vital Statistics on Congress*, Brookings Institute (July 11, 2013), https://www.brookings.edu/wp-content/uploads/2016/06/Vital-Statistics-Chapter-5-Congressional-Staff-and-Operating-Expenses_UPDATE.pdf. Another large share are in, or have friends and family in, the many law enforcement groups who took part in responding to January 6. As reported in the Human Capital Strategic Plan, as of early 2021, 2,250 individuals were employed by the U.S. Capitol Police Force. *Human Capital Strategic Plan 2021-2025*, U.S.Capitol Police (2020), https://www.uscp.gov/sites/uscapitolpolice.house.gov/files/wysiwyg_uploaded/USCP%20Human%20Capital%20Strategic%20Plan%20for%202021-2025.pdf. 4,400 individuals are employed by the Metropolitan Police Force, and 2,700 individuals are active members of the D.C. National Guard. *See Metropolitan Police Force Annual Report 2020*, DC.gov (2020),

https://mpdc.dc.gov/sites/default/files/dc/sites/mpdc/publication/attachments/AR2020_lowres_a.
pdf .

This means that an enormous share of District of Columbia residents has significant and
unique connections with individuals or institutions that were affected by January 6. Such
connections are not likely to be present in any other comparable district. The government has
characterized the events of January 6 – including the charges in which the government alleges
the Prices participated – as an attack on our elections, government institutions generally, and
democracy as a whole, suggest that those District residents closely connected to the government
are more likely to view themselves as the direct victims of the events.

Second, even District residents that have no direct connection to the government reported
feeling deeply traumatized by the events that took place so close to where they live and work.
For example, one DC resident shared in an interview that:

> I have not been able to digest any of the atrocities that took place last night
>
> here in Washington, D.C., you know, literally eight blocks away from my
>
> front door[.] I've been having a lot of conversations with people this
>
> morning, loved ones. We're all hurting. We're terrified. We're in shock.
>
> And I think it's going to take a while. This is by far the darkest moment of
>
> my 45-year existence. *See D.C. Resident Who Gave BLM Protesters*
>
> *Refuge Condemns 'Atrocities' at U.S. Capitol*, CBC (Jan. 7, 2021),
>
> https://www.cbc.ca/radio/asithappens/as-it-happens-thursday-edition-
>
> 1.5864816/d-c-resident-who-gave-blm-protesters-refuge-condemns-
>
> atrocities-at-u-s-capitol-1.5864894.

Such accounts are typical of those gathered in interviews in the days following January 6, during which the Mayor declared a state of emergency, implemented a city-wide curfew, restricted accessto particular roads and bridges, and requested that residents not attend inauguration. (*See Mayor Bowser Orders Citywide Curfew Beginning at 6PM Today, DC.gov (Jan. 6, 2021),* https://mayor.dc.gov/release/mayor-bowser-orders-citywide-curfew-beginning-6pm-today;*Mayor Bowser Issues Mayor's Order Extending Today's Public Emergency for 15 Days*, DC.gov (Jan 6, 2021), https://mayor.dc.gov/release/mayor-bowser-issues-mayor%E2%80%99s-order-extending-today%E2%80%99s-public-emergency-15-days-a1, District neighborhoods became occupied by the Metropolitan Police and over 25,000 military personnel in the weeks that followed.  *See* Ellen Mitchell, *Army: Up to 25,000 National Guard in DC for Biden Inauguration*, The Hill (Jan. 15, 2021),https://thehill.com/policy/defense/534497-army-up-to-25000-national-guard-in-dc-for-biden-inauguration.   Indeed, a local subsidiary of the national public broadcasting network, *DCist*, reported that: "residents are also worried that a stepped up military and police presence in the city may only add to their unease." *See Jenny Gathright and Rachel Kurzius, What It Feels Like to Live Under D.C.'s State of Emergency, DCist (Jan. 13, 2021), https://dcist.com/story/21/01/13/dc-state-of-emergency-residents/.*

Moreover, as the Court is no doubt aware, the effects of these events continue to be felt in the District. Indeed, District residents reacted with fear in anticipation of protests planned for September of 2021 that were intended to show support for individuals detained in connection with prosecutions arising from the events of January 6. For example, the *New York Times* ran a piece titled "Washington, D.C. On Edge Over January 6 Protests," (*See* Jonathan Weisman and

Matthew Rosenberg, *Washington, D.C., on Edge Over Protest of Jan. 6 Arrests*, N.Y. Times (Sept. 18, 2021), https://www.nytimes.com/2021/09/18/us/politics/capitol-sept-18-rally.html.) and the Associated Press similarly reported "In Edgy Washington, Police Outnumber Jan 6 Protestors," capturing the District's overall tenor and response to these ongoing demonstrations. *See* Associated Press, *In Edgy Washington, Police Outnumber Jan. 6 Protesters*, US News (Sept. 18, 2021),https://www.usnews.com/news/politics/articles/2021-09-18/police-say-theyre-ready-for-rally-supporting-jan-6-rioters.

Third, an overwhelming number of District of Columbia residents — over 92 percent — voted for President Biden. *See General Election 2020: Certified Results*, DC Board of Elections (Dec. 2, 2020), https://electionresults.dcboe.org/election_results/2020-General-Election. According to the government's theory of the case, the Prices and the others charged in connection with January 6 did what they did in order to prevent Joseph Biden from becoming President notwithstanding his share of the electoral and popular vote. That is, the government's theory is that the Prices and others were seeking to nullify the votes of an overwhelming majority of District residents (*See* Id.) – in the *only* national election in which District residents have any say, given their lack of representation in Congress. *See, e.g*., *Castanon v. United States*, 444 F. Supp. 3d 118, 139 (D.D.C. 2020) ("Article I contemplates that only 'residents of actual states' have and may exercise the House franchise") (citing *Adams v. Clinton*, 90 F. Supp. 2d 35, 47 (D.D.C.), *aff'd sub nom. Alexander v. Mineta*, 531 U.S. 940 (2000)), *reconsideration denied*, No. CV 18-2545, 2020 WL 5569943 (D.D.C. Sept. 16, 2020), *aff'd*, No. 20-1279, 2021 WL 4507556 (U.S. Oct. 4, 2021). Finally, the government, the media, and even judges in this district speak of these prosecutions as designed to prevent "another January 6," and District of Columbia residents know that a repeat of January 6 can only take place in their home. As such, the

residents of the District sitting as jurors are highly likely to view the Prices not only as someone who victimized them, but also as someone who might victimize them again in the future, raising a concern about punishing for propensity.

Given the electoral makeup of the District, it would be impossible to empanel a jury that was not full of people that the government charges were the targets of the Prices' alleged offenses. *Cf. Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (the population of the greater metro area, including Virginia and Maryland, was large enough to not support an inference of prejudice by media reporting). Thus, though significantly more populous than the pool in *Rideau*, for example, The Prices submit that the impact of the events of January 6 was felt by a far greater proportion of the residents and felt much more personally and viscerally. The events of January left those residents—and therefore the jury pool—neither impartial nor indifferent.

**B. The Nature and Volume of National and Local Media Coverage Weigh in Favor of Finding That There is a Presumption of Prejudice because of Greater Saturation and Impact at the Local Level**

Where pervasive pretrial publicity has "inflamed passions in the host community" and "permeat[es] the trial setting . . . [such] that a defendant cannot possibly receive an impartial trial," the district court must presume local prejudice and transfer the proceeding. *United States v. Quiles-Olivo*, 684 F.3d 177, 182 (1st Cir. 2012); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due [P]rocess requires that the accused receive a trial by an impartial jury free from outside influences."). This is especially true where publicity is both extensive and sensational in nature. *Quiles-Olivo*, 684 F.3d at 182. That said, observing that "prominence does not necessarily produce prejudice, and juror impartiality does not require ignorance," the Supreme Court has repeatedly rejected claims of prejudice that rely exclusively on negative but

dispassionate media reporting. *Skilling*, 561 U.S. at 358 (citing *Irvin*, 366 U.S. at 722).

Something more, such as charged rhetoric or the reporting of gruesome details, is needed to

establish prejudice. *See id*. (rejecting the argument that media coverage was prejudicial where

"media coverage, on the whole, had been objective and unemotional, and the facts of the case

were neither heinous nor sensational."). The Court has repeatedly recognized that "something

more" exists when the media coverage is particularly inflammatory, and where it pervades the

court proceedings. *See Murphy*, 421 U.S. at 799 (1975) ("In those cases the influence of the news

media, either in the community at large or in the courtroom itself, pervaded the proceedings");

*see also id*. ("[P]roceedings in these cases were entirely lacking in the solemnity and sobriety to

which a defendant is entitled"). Finally, the problematic media must either be local in

distribution, or must have greater local saturation or impact than in other districts; otherwise,

there is no disparate prejudicial effect between different (comparable) venues.

For example, in *Skilling*, the defendant cited to hundreds of media reports about the

Enron scandal in his motion for a transfer of venue. 561 U.S. at 358. He argued that as the

former Chief Executive Officer, such articles necessarily implicated him by proxy, if not

directly. *See id*. The Court disagreed, referencing its earlier opinions concerning the modern

ubiquity of news media, and reiterating its former conclusion that volume does not, on its own,

create prejudice. *See id*. at 382. Rather, it is sensationalism of the type that would be easily

remembered—not an objective reporting of the facts—that was found to be prejudicial in prior

cases before the Court. *Id*. at 381. Of course, as the concurrence in part pointed out*, voir dire*

later revealed that these "objective" media reports had indeed created a bias among many

potential jurors, and that the District Court failed to properly vet their assurances of impartiality

after those biases were revealed. *See id*. at 427 (Sotomayor, J., concurring in part). The Court

observed that the stories that *Skilling* cited about Enron contained "no confessions, no blatantly prejudicial information," and were "largely objective and unemotional." *Id.* at 370-71, 382 (observing that none of the reports "invited prejudgment of his culpability"). As such, the Court held that it was inappropriate to apply a broad presumption of prejudice.

Here, in a city still feeling the impacts described *supra*, the pre-trial publicity—both national and local–has only served to enhance and sustain the effects and by extension, sentiments about the participants. The volume, depth of coverage, and duration of the reporting about January 6 has been unprecedented, perhaps only comparable to the reporting following September 11. (*See* "Nearly seven-in-ten adults (69%) say they have heard 'a lot' about the rioting at the U.S. Capitol on Jan. 6." *Views on the Rioting at the US Capitol*, Pew Research Center (Jan. 15, 2021), https://www.pewresearch.org/politics/2021/01/15/views-on-the-rioting-at-the-u-s-capitol/ ; *compare with The War On Terrorism*, Pew Research Center (May 23, 2002), https://www.pewresearch.org/journalism/2002/05/23/the-war-on-terrorism/.) And viewers who identified as Democrats—like most of the District population—were 20% more likely to have reported hearing "a lot" about the events than those who identify as Republicans. *Id.* It has also been sensational, including the repeated showing of select snippets of photographic and video footage appearing to show the destruction of the Capitol property and officers in distress. Indeed, some of these officers have testified before Congress about their experiences that may or may not have been representative of the whole—testimony that was also widely circulated in print and through video. *See, e.g.*, *Police Officers Deliver Emotional Testimony About Violent Day at the Capitol*, Washington Post (July 27, 2021), https://www.washingtonpost.com/politics/2021/07/27/jan-6-commission-hearing-live-updates/

The coverage has also been sensationalist, relying on gruesome details in click-bait headlines to galvanize the public. This is hardly comparable to the "unemotional" reporting on Enron's collapse and the white-collar crime allegations against its management as described by the Court in *Skilling*. 561 U.S. at 371-72, 382.

Additionally, much of the early reporting has since been shown to be factually inaccurate. For example, immediately following the events of January 6, President Biden, among other high-profile individuals, claimed that January 6 protestors *killed* Officer Brian Sicknick, and he repeated the claim months after it became clear that there was no basis for it. *See* Christian Datoc and Jerry Dunleavy, *Biden Claims Jan. 6 Rioters Killed Capitol Police Officer Brian Sicknick*, Washington Examiner (June 17, 2021), available at https://www.yahoo.com/now/biden-claims-jan-6-rioters-161300824.html. Even the official press release stated that:

Officer Brian D. Sicknick passed away *due to injuries sustained while on-duty*. Officer Sicknick was responding to the riots on Wednesday, January 6, 2021, at the U.S. Capitol and was injured while physically engaging with protesters. *See Press Release: Loss of USCP Officer Brian Sicknick*, United States Capitol Police (Jan. 7, 2021) (emphasis added),

https://www.uscp.gov/media-center/press-releases/loss-uscp-colleague-brian-d-sicknick.

These claims were widely circulated and did reputational damage to defendants before the medical examiner quietly reported—more than four months later—that Officer Sicknick died of two strokes, and that he sustained no internal or external injuries from his exposure to chemical spray on January 6. *Capitol Police Officer Died of Natural Causes, Officials Say*, Washington Post (Apr. 19, 2021), https://www.washingtonpost.com/local/public-safety/brian-sicknick-death-strokes/2021/04/19/36d2d310-617e-11eb-afbe-9a11a127d146_story.html.

The saturation of this charged and inflammatory reporting in the District is so substantial that it would be surprising to identify any potential jurors who have not been exposed to the coverage. One only need look to the Washington Post comments section to observe the inflammatory attitudes of its readers who convict defendants who are still pending trial. *See* Ralph Joseph Celentano III, accused Capitol rioter, charged with pushing officer over ledge - The Washington Post

And although some in the jury pool may not have heard of the Prices specifically, their presence at the Capitol that day will necessarily cause prospective jurors to link their conduct to the January 6 reporting generally. And as the Court found in *Rideau*, "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." 373 U.S. at 726.

### C.  The Timing of the Proceedings Weighs in Favor of Finding a Presumption of Prejudice

Finally, in determining whether any prior prejudice has been mitigated by the passage of time, the Supreme Court has considered the years between the exposure of the offense conduct and the trial. For example, in *Skilling*, the Court found that because more than four years had passed between the Enron scandal and the defendant's trial, "the decibel level of media attention diminished somewhat in the years following Enron's collapse," and any exposure to the early reporting would have become attenuated. *Skilling*, 561 U.S. at 383. Here, in the 17 months since January 6, 2021, media reporting about the events of January 6 remains at an all-time high. This has been especially true in recent weeks, given the high-profile House Select Committee activities focused on investigating the events. In the last two months alone, new in-depth articles and video analyses about January 6 have appeared in the *Washington Post*, *New York Times*, *CNN*, *Vanity Fair*, *Rolling Stone*, and *NPR*, among many others.  *See* Dan Berman, *The Latest in the Jan. 6 Investigation*, CNN (Nov. 28, 2021),

https://www.cnn.com/2021/11/28/politics/january-6-investigation/index.html; *see also Inside the Capitol Riot: An Exclusive Video Investigation*, N.Y. Times (Nov. 10, 2021),

https://www.nytimes.com/2021/06/30/us/jan-6-capitol-attack-takeaways.html; *see also* Jacqueline Alemany et al., *The Attack*, Washington Post (Sept. 26, 2021),

https://www.washingtonpost.com/politics/interactive/2021/jan-6-insurrection-capitol/; *see also* Hunter Walker, *The 'JusticeForJ6' Rally Wasn't a Joke — It Was A Warning: support for the Capitol insurrectionists has taken root firmly inside the GOP*, Rolling Stone (Sept. 18, 2021),

https://www.rollingstone.com/politics/politics-features/justiceforj6-rally-insurrection-capitol-trump-1228690/; *see also* Bess Levin, *January 6 Organizers Threw Back Champagne and Charcuterie as the Capitol Was Attacked*, Vanity Fair (Nov. 22, 2021),

https://www.vanityfair.com/news/2021/11/january-6-organizers-text-messages-champagne-charcuterie. Additionally, many documentaries that include extensive footage of the day have been released—footage that would likely be offered into evidence by the prosecution at trial. For example, HBO recently released a feature-length *Four Hours at the Capitol* in late October, which includes one of the most widely-circulated videos from that day: the breaking of a Capitol window. *See Four Hours at the Capitol*, HBO (Oct. 4, 2021); *see also Day of Rage: How Trump Supporters Took the U.S. Capitol* at 18:17-21, N.Y. Times (June 30, 2021),

https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trump-supporters.html.

There is no reason to think that coverage will wane before the Price's December trial, especially given the recent activities of the Select Committee. Interest in the events of January 6 has been high since that day, and it has not waned in the District in the short time since. As such, the timing of the proceedings weighs in favor of a finding of presumed prejudice.

**RECOMMENDATION FOR VENUE**

The Prices argue that Washington D.C. may be among the worst venues and venires with respect to the concerns articulated in this memorandum.  The U.S. District Courts in Alexandria, Virginia and at Greenbelt Maryland reflect similar problems because of the proximity to the Washington D.C. media market.  The other closest U.S. District Court which is the closest to the Prices, not too far from the area, and which would make a significant difference with respect to the concerns the Prices raise would be the U.S, District Court for the Northern District of West Virginia at Martinsburg, West Virginia.  This location would be under an hour from the Prices and under 2 hours from the D.C. District Court.

**CONCLUSION**

Because each of the *Skilling* factors weighs in favor of finding a presumption of prejudice, and because the Sixth and Fifth Amendment demand a unique analysis of the problems in the instant case, the Prices request to transfer venue and, in the alternative, provide relief as described in the motion and this memorandum.

July 22, 2022.                                        Respectfully submitted,

                                                     /s/ Nandan Kenkeremath

                                                     Nandan Kenkeremath
                                                     DC Bar 384732
                                                     2707 Fairview Court
                                                     Alexandria, Virginia 22311
                                                     703-407-9407

                                                     *Counsel for Defendants*

35