**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:21-cr-00719 (JEB)** |
| **CYNTHIA BALLENGER and CHRISTOPHER PRICE,** | |
| **Defendants.** | |

## DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION TO TRANSFER VENUE

The Prices file this reply in further support of their motion to transfer venue to a

district that will ensure a fair jury trial, with a specific proposal to transfer to the

U.S. District Court for the Northern District of West Virginia at Martinsburg, West

Virginia.  The Government fails to address many of compelling reasons to transfer

venue, which would help protect the Prices' constitutional right to an impartial jury.

The Government also offers no support for a jury questionnaire which would be one

tool to help with the substantial Fifth and Sixth Amendment problems. The Prices

cited to *Marshall v. United States* 360 U.S. 310, 312 (1959) and other cases

providing the courts authority to address unique Fifth and Sixth Amendment

problems and go above Constitutional requirements.  *See* ECF 57-1 at 1-2.  The

Government does not address these points. As noted in the original memorandum

the Court should consider every avenue to preserve the rights of the Fifth and Sixth amendment including change of venue, change of venire, extra voir dire, and possible continuance.

### I. The Government Neither Acknowledges the Nature and Degree of Adverse Pre-trial Publicity nor the Partisan Bias Regarding January 6, 2021 Cases

The Government argues that the problem of a partial jury in the District of Columbia instant case is no more significant in than *Skilling v. United States*, 561 U.S. 358, 378 (2010) and *United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976) and that, in any event, the tool of voir dire can find an impartial jury in the District of Columbia.  The Government fails to acknowledge that the pre-trial publicity for the January 6, 2021 cases is far greater in amount, type, ferocity, repetition, constancy, persistence, partisanship, and the potential for partisan jury bias than *Skilling* and *Haldeman* and, likely any Federal case outside of the other January 6th cases.  As stated in the Prices' original memorandum pre-trial publicity seeking to impute collective guilt and providing prejudicial characterizations is massive and unprecedented.  The Government simply ignores the force of the problem.  The record of the problem has only grown since the original motion.  Just as one example, consider President Biden's recent Soul of the Nation Speech:

> ….They look at the mob that stormed the United States Capitol—brutally attacking law enforcement not as insurrectionists who placed a dagger to the throat of our democracy but they look at them as patriots….We saw law enforcement brutally attacked on January 6th…. Ladies and gentlemen, we

can't be pro-insurrectionist and pro-American…the darkness of

Charlottesville, of COVID, of gun violence, of insurrection. See

https://www.whitehouse.gov/briefing-room/speeches-

remarks/2022/09/01/remarks-by-president-bidenon-the-continued-battle-for-

the-soul-of-the-nation. Last accessed 9/14/2022.

Flanked by marines, [*see* https://www.military.com/daily-news/2022/09/02/white-

house-says-marines-biden-speech-meant-show-respect-military.html] (last Accessed

9/14/2022) the President uses the opportunity to claim the Republican Party is

"intimidated by Donald Trump and the MAGA Republicans, and that is a threat to

this country." *Id.*  This is the Democrat party campaign theme for the 2022 elections

and the trial of the Prices is currently scheduled to immediately follow what will no

doubt be endless repetition of these partisan themes.

As discussed in the original memorandum below, these constructs include

repeated generalized allegations of 1) the violent mob; 2) white supremacy; 3)

terrorism; 4) insurrection; and 5) deaths purportedly connected to January 6, 2021.

These generalized themes would be presumably barred at trial as being irrelevant,

however, the presentation of these narratives outside of the trial creates

presumptions that bias jury pools and a District of Columbia jury pool would be

either the worst or among the worst to be susceptible.

It is not surprising to the Prices, through the Government's memoranda,  are

met not by an explanation of specific conduct that is disorderly or disruptive on

their part but rather the argument that the Prices were "amongst a mob of rioters"

or "acting in concert with hundreds of other rioters" [ at 14] or "joined a riot." The Government's approach seeks to imply collective guilt and not identifying specific conduct of the defendants—which the Government cannot.  A partisan, biased jury is more likely to take the bait and not review the specific conduct of the Prices. This is the Fifth and Sixth Amendment concern.

The Government attacks the objective jury survey that provides statistical data which suggests that it would be near impossible to impanel a fair jury in this case. The government then suggests a novel solution – it encourages the Court to spend time and resources, empanel a venire, and undertake a time-consuming voir dire and then decide if the objective data in the jury survey is in fact accurate.

For the reasons discussed below, the government's arguments are without merit and do not address the main issue before the court: the irreparable bias that exists if venue were deemed to be proper in Washington, D.C. (herein after "D.C.").

## II.   <u>The Government Fails to Undermine the Jury Survey that Exposes the Clear Bias that Exists in the D.C. Jury Pool</u>

To elucidate, the Prices argue that one reason the jury pool shows bias is the continuous negative media coverage that the January 6 defendants and their cases have received.  The data that supports this argument is found in the jury survey described in the original complaint memorandum at 19 and was first submitted with a supplement to the Motion to Change Venue filed in *U.S. v. Gieswein*, 21-cr-24 (EGS (ECF 101, Attachment 1)(Select Litigation Survey).  The Select Litigation Survey explains that after potential jurors were polled, 90% of them were exposed to media coverage and that most of them say the media coverage implied that the defendants

are "guilty of the charges brought against them." Id. Jury Survey at pg. 3.

The government tries to undermine the jury survey itself by suggesting that the Court should not consider the data because (1) courts have "commonly rejected such polls" and (2) based on only one critique as to the methodology employed.  *See* Gov. Opp. at 15-22.

### A. The Government selects past cases where the polls were distinguishable from the instant one.

In its opposition, the government cites cases that found survey results could not support a finding of presumed prejudice. *Id*. However, in many of those cases, the survey participants were asked entirely different questions than the ones asked here. Most notably, in many of those cases, the participants were not asked to opinion on the "guilt" of the defendants.  *See, e.g., United States v. Campa*, 459 F.3d 1121 (2006) (survey in support of transfer motion in Miami district were not asked to opine on anyone's guilt).

Furthermore, the government's reliance on *U.S. v. Haldeman*, 559 F. 2d 31, 64 n. 43 (D.C.C. 1976), relegated to a footnote is misplaced for two reasons.  First, the government generalizes that polls can be open to errors and should be viewed as suspect because appellants pay the expert to conduct the poll.  *Id*.  But, the government routinely pays the expert it hires, and surely the rules for the DOJ are no different than those for a defendant. All experts are paid and that goes to weight not admissibility.  Also relevant is that the *Haldeman* court does not address why the specific expert hired in *Haldeman* was not be trusted and why or how that poll was flawed.

Secondly, in *Haldeman*, the Court reviewed the media coverage and the overwhelming pre-trial publicity was found to consist of "straightforward, unemotional factual accounts of events" rather than the inflammatory nature of the media coverage in these cases. *Id*. at 61, *See also U.S. v. Rodriquez*, No. 07-1316 (8th Cir.), 2008 WL 194877, at *19 (cited by the government but where court also found the poll did not demonstrate the media coverage being "inflammatory"). Therefore, *Haldeman* is entirely different than the instant matter and provides no support or basis for rejecting the poll results here.

## B. The critique that the poll does not provide an option of "unsure" about guilty is unavailing.

The government's only critique of the questions asked by the expert in conducting the poll is that the expert did not instruct the participants that they could answer by saying they were "unsure" about the guilt of January 6 defendants. *See* Gov. Opp. at 19-20. However, the government relies only on a single source, without further argument, that opined that respondents must be made aware of this option. *Id*. The government offers no evidence such an option is widely adopted by other experts in the area. That comes as no surprise as peer-reviewed research published four years after the government's citation explains precisely why offering an option of "don't know" (or unsure) may ultimately discourage people to "generate a meaningful answer from expressing it." Jon A. Krosnick & Stanley Presser, "Question and Questionnaire Design," in *Handbook of Survey Research* (2d. ed. 2010,

Peter V. Marsdean & James D. Wright, eds.) at 263, 282.[1]  Lastly, as the government points out, the jury survey results here reveal that about a quarter of respondents did not respond concretely and rather said they did not know or that it depends or refused to answer all together.  Select Litigation Survey, Jury Survey at pg. 14. Clearly people know, even when not specifically instructed, that "unsure" is always an available response.

### III.   The Government Ignores the Impact of the Constant Pre-trial Publicity in January 6 Cases whose Uniqueness is conceded by Attorney General Garland and the DOJ.

Simply put, this is the most unique set of prosecutions in American history and is a case of first impression. The Prices do not argue that the "mere existence" of pre-trial publicity creates a presumption of prejudice, but rather that the pre-trial publicity has been constant, unrelenting, and has been irreversibly biased towards the guilt of these defendants. The government attempts to compare the pre-trial publicity of January 6, 2021, to other high-profile cases such as the Boston Marathon bomber prosecution, the fraud trial of CEO of Enron, the Watergate prosecutions, and the 9-11 prosecutions. *See* Gov. Opp. at 4-6.  And yet it ignores the biggest difference between those cases and the January 6 prosecutions.  Unlike any other case, the January 6 prosecutions involve over 800 individuals so far with the DOJ being on the record as saying that 1000 more arrests are to be expected. Below is what the Attorney General proclaimed about the January 6 prosecutions:

**Extraordinary resources devoted to the Jan. 6 probe**

---

[1] Emerald_HSR-V017_9 263..313 (stanford.edu).  Last accessed 9/14/2022.

> Every FBI office, almost every U.S. attorney's office in the country is
> working on this matter. We've issued thousands of subpoenas, seized
> and examined thousands of electronic devices, examined terabytes of
> data, thousands of hours of videos. People are working every day, 24/7,
> and are fully aware of how important this is. This had to do with the
> interference with the peaceful transfer of power from one administration
> to another. And it doesn't get more important than that.[2]

Media coverage has been relentless. As the jury survey points out, 93% of the

D.C. jury pool is aware that "several hundred people were arrested on charges

related" to January 6, 2021. *See* Select Litigation, Jury Survey at pg. 2.  The almost

daily reporting of capitol protest prosecutions makes this case more like *Rideau v.*

*Louisiana*, 373 U.S. 723, 727 (1963), where the Supreme Court found the people of

Calcasieu Parish saw and heard Rideau's confession too many times and as a result

a fair trial was not possible there.

The Prices have provided an extensive account of the President, Vice President,

local politicians, public proceedings, local court actions, and even the local NFL

franchise publicly characterizing the actions on January 6, 2022.  Not a single one of

these actors provide the caveat that some people who were in the Capitol may be

innocent.  In an orchestrated fashion and often to partisan effect the statements drill

in the themes of white supremacy, the violent mob, terrorism, threats to democracy.

It should not surprise anyone that this event is a major topic of the upcoming election

cycle as politicians and the political party in power advertises.  There is no case in

history that poses this type of Fifth and Sixth Amendment concerns.

---

[2] *See* https://www.npr.org/2022/03/10/1085016383/garland-says-the-jan-6-investigation-wont-end-until-everyone-is-held-to-account. Last accessed 9/14/2022.

In the instant case, we are already seeing the Government beginning to use statements evidence from public discussion as some sort of legal basis.  In the initial memorandum the Prices we pointed to a statement of the Honorable Judge Royce Lamberth at a sentencing hearing essentially chastising a Republican Congressman over the observations that Congressman had over footage from inside the Capitol that the Congressman reviewed. We do not know why the courts would feel it is their role to opine on public characterizations by political figures.   Sure enough, the Government in their response to the Prices motion to dismiss cites the Lamberth statement as if it has legal meaning.

> As Judge Lamberth stated in the sentencing hearing in United States v. Anna Morgan Lloyd, 1:21-cr-164 on June 23, 2021, "I'm especially troubled by the accounts of some members of Congress that January 6th was just a day of tourists walking through the Capitol. I don't know what planet they were on." Transcript at p. 19. See id. at p. 20 ("the attempt of some congressmen to rewrite history and say this was all just tourists walking through the Capitol is utter nonsense."). [ECF 63 Government Opposition to Defendants' Motion to Dismiss at 21

The statement of Judge Lamberth, as one example, involves information not presented in a court of law. No attorney discussed the statements of the Republican Congressman before Judge Lamberth. In fact, the public debate goes to the heart of the question of whether the Prices will be judged on his conduct or judged on the imputed conduct of others.  Moreover, the Prices, and all defendants, are currently limited under a protective order from discussing potentially similar footage from surveillance cameras that was the subject of the Republican Congressman's statement. Judge Lamberth may or may not misstate the point the Republican

Congressman made. With respect to the instant case, the Lamberth statement has nothing to do with the Prices. The Statement of Judge Lambert has nothing to do with the Tourist standard, the First Amendment or §5104(e)(2)(G), which was the subject of discussion that the Government was addressing. If the Government and Courts are going to use statements from public discussion characterizing issues as if they had legal weight, how is can one not expect partisan bias from this category of public discussion undermining the Fifth and Sixth Amendment rights to limit consideration to the evidence from the trial?

Similarly, the people of D.C. have been exposed to the January 6 prosecutions almost on a daily basis and have read too many articles depicting defendants in a negative and inflammatory fashion. The Prices are hard pressed to find a single mainstream newspaper article that casts a January 6 defendant in a positive or unbiased light.

The Prices have shown that they cannot receive a fair and impartial trial in D.C. because the constant media coverage affects D.C. residents in a way that does not affect other parts of the country. D.C. residents were present in the city during a national disaster that directly affected them, making them alleged "victims" in a sense. As a result, D.C. residents would be more afraid of a January 6 recurrence than anyone else in the country. The D.C. local media coverage is also more consistent because this is where all of the hearings are taking place, making it more of a priority to regularly report.

## IV.    Voir Dire Cannot Fix this Problem

The government proposes that voir dire is the solution here pointing to past jury trials where the government opines that a fair jury was selected. *See* Gov. Opp. at 22-26. The first flaw with the government's argument is that it does not allow for any scenario in which a transfer of venue is granted short of proceeding to voir dire. If presumptive prejudice exists, it follows that the prejudice is carried into voir dire and irreversibly comprises the process no matter how many safeguards are in place. At that point, it is not the Court's fault that a fair jury cannot be selected, it is a virus that has spread with no cure. If voir dire could fix any presumptive prejudice, then a transfer of venue would never be granted and the defendant in *Rideau v. Louisiana*, 373 U.S. 723 (1963) would have remained convicted in violation of his Sixth Amendment right to a fair trial. In *Rideau*, the court emphatically stated:

> We do not hesitate to hold, *without pausing to examine a particularized transcript of the voir dire examination of the members of the jury*, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised interview.

*Id*. at 727 (emphasis added). The Court in *Rideau* recognized that what had transpired in that community was far too pervasive to be cured by the voir dire process. While the Prices did not participate in a televised confession, the media has released statements from his phone and photographs of him inside the building. The media continues to release every piece of negative evidence found in all January 6 cases. The community has been bombarded by incriminating evidence of all January 6 defendants and it will be impossible for a jury in D.C. to put aside what has been already hammered into them – that these defendants are not only all guilty but that

they are terrorists and insurrectionists.

Voir dire is not a perfect process as the government suggests, especially in a courtroom where the media is watching every move and reporting on it. Even without that added spotlight, many people do not want to admit that they cannot be fair even if that is what they feel. There is an obvious temptation to not want to recognize your own prejudice, which makes a telephone poll when there is no pressure and anonymity more likely to produce honest results.[3]

## CONCLUSION

For all the reasons discussed above, and those in the Prices' moving papers, the Court should grant the Prices' motion to transfer venue and, in the alternative, provide relief as described in the motion to transfer and original memorandum of points and authorities in support.

Dated: September 14, 2022        Respectfully submitted,

/s/ Nandan Kenkeremath

Nandan Kenkeremath
DC Bar 384732
USDC DC 384732
2707 Fairview Court
Alexandria, Virginia 22311
703-407-9407
Email: nandank@comcast.net

*Counsel for Defendants*

---

[3] Eileen C. Moore, Judicial Voir Dire More Important Than Ever, 13 Cal. Litig. 45, 45 (2000) ("I have concluded from my experience as a trial judge . . . that, perhaps due to political correctness, agendas or disgust with the system, many jurors either attempt to hide their true feelings, or approach their task with preconceptions, cynicism and activism."); Jerry Markon, Jurors With Hidden Agendas, Wall St. J., July 31, 2001, at B1.