**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**CYNTHIA BALLENGER and**<br>**CHRISTOPHER PRICE,**<br><br>**Defendants.** | **Criminal Action No. 21-719 (JEB)** |

**<u>MEMORANDUM OPINION</u>**

On March 21, 2023, after a bench trial, the Court found Cynthia Ballenger and her husband Christopher Price guilty of four counts arising from their participation in the insurrection at the United States Capitol on January 6, 2021.  Defendants have filed two Motions: one for a judgment of acquittal and the other for a new trial.  The Court will deny both.

**I.     Background**

On the infamous date of January 6, Defendants traveled to the United States Capitol from Emmitsburg, Maryland, walked across restricted Capitol grounds, and entered the Capitol building through the breached Senate Wing Door.  The Government consequently charged both with four counts arising from those events: (i) Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (ii) Disorderly or Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (iii) Disorderly or Disruptive Conduct in a Capitol Building or Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  <u>See</u> ECF No. 38 (Information).  After the Court denied a string of pretrial

1

motions and the parties proposed instructions on each count, Defendants went to trial.  See United States v. Ballenger, No. 21-719, 2022 WL 14807767, at *1 (D.D.C. Oct. 26, 2022) (denying motion to dismiss Information); United States v. Ballenger, No. 21-719, 2022 WL 16533872, at *1 (D.D.C. Oct. 28, 2022) (denying motion for change of venue); Trial Transcript of Mar. 20, 2023 (Tr. I) at 4–7 (denying motions to preclude and suppress evidence); Trial Transcript of Mar. 21, 2023 (Tr. II) at 4–5 (acknowledging areas of disagreement in proposed instructions).

Trial began on March 20, 2023, and concluded the following day.  See Minute Entries of Mar. 20–21, 2023.  The Court heard testimony from four Government witnesses and from Defendant Ballenger.  See Tr. I at 2; Tr. II at 2.  It found that all Government witnesses, including an officer who was at the Senate Wing Door when Defendants entered the building, testified credibly.  See Tr. II at 166.  Ballenger, the Court found, was a "largely incredible witness" given her recanting, denials of the obvious, and claimed failure to notice what was plainly visible.  Id. at 169–70.

The facts the Court found were as follows:  Prior to traveling to the Capitol that day, Ballenger stated in texts or Facebook posts that "the time has come" and that she "needed to do something more than vote."  Id. at 167.  She came to the Capitol armed with pepper or bear spray and a pocket knife.  Id.  While attending former President Trump's rally, Ballenger and Price found it difficult to hear him and decided to head to a nearby café instead.  Id. at 168.  There, Ballenger heard "flash bangs" and "received a text that the Capitol had been breached."  Id.  Price "believed that he heard a bomb."  Id.  The two "also observed a multitude of police cars, of sirens, of officers, [and] fire engine[s] with lights flashing," but "nonetheless decided to head up to the Capitol grounds."  Id.

At the time, the Court found, the Capitol was closed, for both the COVID-19 pandemic and the joint session of Congress at which the Vice President — a Secret Service protectee — was present to certify the election.  Id. at 166.  The "entire perimeter of the Capitol grounds was restricted," too, "via bike racks, snow fencing, and area closed signs."  Id.  Hours after the Vice President arrived, Defendants entered the Capitol grounds area by "stepping over an Olmsted wall and pass[ing] snow fencing" and "bike racks that were down."  Id. at 167–68.  Around the same time, Price texted, "[W]e're just taking over the Capitol."  Id.  He also took a video of a woman repeatedly banging on a Capitol window, id. at 168–69, and shared his observations of "tear gas and explosions going off, someone on the floor, [and] CPR administered."  Id. at 169.  The two marched onwards to the Capitol building.

The Senate Wing Door was "only for fire and emergencies" and was "typically not open."  Id. at 166.  Officers "were holding off rioters" at that door, but "[p]eople were yelling" and "breaking windows."  Id. at 167.  The officers "could not stop the rioters who broke through" the Senate Wing Door.  Id.  Defendants could hear alarms going off and observed tear gas and officers in riot gear.  Id. at 169.

Defendants nonetheless entered through the breached doorway.  They did so "without pushing or shoving anyone."  Id.  By then, a desk was "being used as a barricade to the door" that had not been breached, and "the officers [had] created a line to prevent people" who had entered through the breached Senate Wing Door from crossing the foyer inside.  Id. at 167.  "There was broken glass on the floor," and "[s]irens were going off from inside the building which were deafening."  Id. at 167, 169.  Price texted, "[I]n and broken glass everywhere," and as the crowd was chanting, "[F]ight for Trump," he texted, "[W]orth fighting for Trump[.]"  Id. at 169.  The two walked around inside the building for approximately seven minutes.  Id.

Shortly afterwards, Price exclaimed, "[W]e went inside.  They can't stop you.  It's the people's house."  Id. at 169.  Ballenger texted, "[W]e stormed the Capitol" and that they "totally owned it."  Id.

After denying two oral motions for judgment of acquittal, see Minute Entry of Mar. 21, 2023; Tr. II at 26, 31, 130, the Court convicted each Defendant of all four counts.  See Tr. II at 171–73.  Defendants have now filed a Renewed Motion for Judgment of Acquittal, see ECF No. 108, and a Motion for a New Trial.  See ECF No. 109.

## II.   Legal Standard

Federal Rule of Criminal Procedure 29(c)(1) provides that "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later."  When considering such a motion, the Court must "consider[] th[e] evidence in the light most favorable to the government" and uphold a guilty verdict if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Wahl, 290 F.3d 370, 375 (D.C. Cir. 2002).  Put another way, the Court must determine whether "a reasonable juror must necessarily have had a reasonable doubt as to the defendants' guilt."  United States v. Weisz, 718 F.2d 413, 437 (D.C. Cir. 1983).

Federal Rule of Criminal Procedure 33(a), in turn, provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  "Trial courts enjoy broad discretion in ruling on a motion for a new trial."  United States v. Wheeler, 753 F.3d 200, 208 (D.C. Cir. 2014).  This is true in part because "[t]he rules do not define 'interests of justice' and courts have had little success in trying to generalize its meaning."  Id. (citation and internal quotation marks omitted).  At bottom, the D.C. Circuit counsels that "granting a new trial motion

is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred." Id. (citation and internal quotation marks omitted).

## III.    Analysis

The Court will address the arguments in Defendants' Motion for Acquittal count by count before turning to their sundry contentions supporting a new trial.

### A.    Count I: Entering or Remaining in a Restricted Building or Grounds

Title 18 U.S.C. § 1752(a)(1) makes it unlawful to "knowingly enter[] or remain[] in any restricted building or grounds without lawful authority to do so."  With respect to this first count, the Court concluded that "on the facts that [Defendants] knew including that there had been a breach, that there were flash bangs, that there were police sirens, that there was an alarm going off, that there were police in riot gear, that there was broken glass, [and] that there was tear gas, any reasonable person would have known they had no authority to enter into the Capitol building." Tr. II at 170–71.  Although the Court acknowledged that whether Defendants knowingly entered the grounds illegally posed a closer question, the Government "ha[d] certainly proven beyond a reasonable doubt that they knew that the Capitol building was a restricted area and one they could not enter, and yet they did so knowingly and willfully and happily." Id. at 171 (emphasis added).  Indeed, Defendants "should have known they couldn't have even been up on the terrace" surrounding the building.  Id.

Price and Ballenger challenge the Court's finding that they entered a "restricted building or grounds" and then argue that even if they did, they did so unknowingly.  The Court takes each argument in turn.

#### 1. *Restricted Building or Grounds*

Defendants assert that they never entered a "restricted building or grounds," which the statute defines to include "any posted, cordoned off, or otherwise restricted area . . . (B) of a

building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance."  18 U.S.C. § 1752(c)(1) (emphasis added); see Acquittal Mot. at 7.  They dispute whether the Capitol grounds they crossed and the part of the Capitol building they entered were "posted, cordoned off, or otherwise restricted" at the time they entered them.  See Acquittal Mot. at 8.  Ballenger and Price argue that this phrase implicitly refers to "tangible, material restrictions," and that "police cars with flashing lights" or "noises" do not a restricted area make.  Id.  The Court declines to adopt this narrow construction of the broad phrase "otherwise restricted."  The flash bangs, sirens, blaring alarm, broken glass, and tear gas that Defendants encountered, see Tr. II at 170–71, were sufficient to mark the areas they crossed as restricted.

Beyond this, the "bike racks and snow fencing, as well as signage indicating that the area was closed," adequately marked the Capitol grounds and the building within it as restricted. United States v. Bingert, No. 21-91-1, 2023 WL 3613237, at *5 (D.D.C. May 24, 2023). Defendants appear to acknowledge these barriers as material restrictions but maintain that because other rioters had cast them aside by the time Ballenger and Price crossed the Capitol grounds, the area was no longer effectively restricted.  See Acquittal Mot. at 8–9.  Rioters' success in knocking down barriers and doors, however, does not strip an area of its restrictions. Although Defendants challenge the foundation for and consistency of Capitol Police Captain Jessica Baboulis's testimony describing the placement of specific barricades, see id. at 8–10, Ballenger admitted on the stand that she and her husband encountered these barriers along their path as they crossed the Capitol grounds.  See Tr. II at 95–96, 99.

If that did not suffice, Defendants certainly entered a restricted area when they walked into the Capitol building, even under their definition.  Their only challenge to that finding is that police were cordoned within, rather than outside, the Senate Wing Door, and that this cordon was not pushing back against the crowd that entered through the breached doorway.  See Acquittal Mot. at 12.  Ballenger, however, admitted on the stand that an additional "line of Metropolitan Police Department officers in bright yellow jackets" stood outside the Capitol, guarding it from the outside.  See Tr. II at 101.  That rioters had pushed the additional line of officers within the building further back by the time Defendants entered makes no difference; their cordon made sufficiently clear that entry into the building was forbidden.

    2.  *Knowing Entry*

Defendants next argue that even if they entered a restricted building, they did so unknowingly.  See Acquittal Mot. at 34.  Even under their proposed definition, "[a] person acts 'knowingly' if he acts voluntarily, realizes what he is doing, and is aware of the nature of his conduct."  ECF No. 99 (Notice of Joint Proposed Elements of Law) at 2.  Video and photographic evidence demonstrated that Defendants, who moved through the Capitol grounds together that day, observed the evidence of restrictions detailed above.  See, e.g., Tr. II at 98 (describing video of Ballenger confronting restrictions).  Although Defendants contest whether they noticed (1) bicycle racks with "area closed" signs, (2) tear gas, and (3) a blaring alarm inside the Senate Wing, see Acquittal Mot. at 36–37, ample evidence supports the Court's finding that they observed these and other restrictions.  See Tr. II at 99 (Ballenger testifying to "walk[ing] right past" bicycle racks and an "area closed" sign); id. at 145 (Special Agent describing text from Price warning of "tear gas and explosions going off"); id. at 105, 111, 129 (Ballenger testifying alarm "was loud" and "definitely going"); see also United States v. Griffith,

No. 21-244-2, 2023 WL 3477249, at *4 (D.D.C. May 16, 2023) (describing "earsplitting alarm" inside Senate Wing Door at approximately 2:50 p.m.).  Nor does the Court's *mens rea* finding depend on these three observations in light of the other restrictions, such as police cordons and snow fencing, that Defendants observed.  Were there any doubt, Defendants contemporaneously expressed their knowledge that their entry was unauthorized: Price exclaimed, "[W]e're just taking over the Capitol," Tr. II at 119, and Ballenger texted, "[W]e stormed the Capitol."  Id. at 117–18.

Defendants maintain that the Court failed to consider two additional facts, but neither is relevant to their knowledge.  First, they point out that "[d]ozens and dozens of people entered the door and exited in approximately the same manner as the Prices."  Acquittal Mot. at 34–35.  That others were engaging in the same conduct has little bearing on Defendants' own knowledge that they (and their companions) were not permitted to be there.  Defendants cannot rely on monkey-see-monkey-do logic where the signs that their presence was prohibited were so glaring.  Second, Defendants emphasize that they "got in line to exit" the Capitol building "within a very short time" after entering.  Id. at 35.  That Ballenger and Price decided not to linger has no bearing on whether they entered knowingly.

B.   Count II: Disorderly and Disruptive Conduct in a Restricted Building or Grounds

Count II charges a violation of 18 U.S.C. § 1752(a)(2), which prohibits "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions."  The Court found that Defendants engaged in "disruptive" conduct "by going into the Capitol as well as by being on the upper west terrace."  Tr. II at 171–72.  It first acknowledged that "if th[eir] conduct had taken place in a

vacuum, it might well not be disruptive," but explained that "the mob clearly . . . did, in fact, impede and disrupt the orderly conduct of government business and that" Defendants joined that group "with the intent to impede or disrupt th[at] business because they didn't want the election to be certified."  Id.

As the Court has already established that Defendants were in a "restricted building or grounds," see Section III.A.1, *supra*, it will move to their contentions that they did not engage or intend to engage in disorderly or disruptive conduct while there before turning to their assertion that they did not in fact impede or disrupt government business.

> 1. *Engaging in Disruptive Conduct*

In a pretrial Motion, Defendants challenged the Government's proposed definition of disruptive conduct ("a disturbance that interrupts an event, activity, or the normal course of a process"), see Joint Elements at 5 (citing 1 Crim. Jury Instructions for DC Instruction 6.643), as "confus[ing]" their conduct "with an event" (the insurrection), and as "imput[ing] the actions of others" to them.  See ECF No. 99-1 (Def. Mem. on Jury Instruction Requests) at 11–12.  They proposed that the Court use "the common meaning of the term disorderly conduct" to define disruptive conduct.  See id. at 12.  Perhaps recognizing that this would conflate "disruptive conduct" with "disorderly conduct," Defendants also proposed an alternative, but ultimately circular, definition of "disruptive."  See Joint Elements at 5 (proposing "disruptive conduct" to mean "specific conduct of the defendant which would itself be identified as disruptive conduct within common and ordinary meaning in a variety of such public settings"); Def. Mem. on Instructions at 12 (acknowledging Defendants' "proposal does not answer many questions").  In light of Defendants' unworkable alternative, the Court has adopted the model instruction the Government proposed.

At trial, the Government acknowledged that Defendants did not "yell[], break[] things, block[] people, jostl[e]," or "threaten[] in some manner," and that their disruptive conduct consisted of their "being part of th[e] mob" that stormed the Capitol, even if their outward contribution to that mob consisted of little more than "walk[ing] in" with its members.  See Tr. II at 137.  Although this presents a closer question than Count I, a rational finder of fact would agree that Defendants' conduct violated the statute.  In United States v. Rivera, 607 F. Supp. 3d 1 (D.D.C. 2022), for example, Judge Colleen Kollar-Kotelly found a defendant who entered the Capitol building and "spent approximately twenty minutes roaming the halls of the Capitol, videoing, livestreaming, and taking selfies" guilty of "disorderly and disruptive conduct."  Id. at 7, 9.  "Even mere presence in an unlawful mob or riot," she explained, is "'disruptive' insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants."  Id. at 8; see also Griffith, 2023 WL 3477249, at *6 ("[E]ven mere presence in these circumstances is in fact disruptive.") (citing Rivera, 607 F. Supp. 3d at 9).  Context and circumstances always matter.  A person standing on a public sidewalk scanning the street commits no crime, but he certainly does so if he is acting as a lookout for others committing a burglary next door.

Defendants were not merely present: they actively participated in the riot.  They latch onto the Court's emphasis on their "being on the upper west terrace" and its reference to their participation in the "mob" as evidence that the Court focused on Defendants' location or the conduct of others instead of their own conduct that day.  See, e.g., Acquittal Mot. at 14–15, 18, 22–23.  That language, however, incorporated the Court's specific factual findings.  In defying restrictions and remaining "on the upper west terrace" — in Ballenger's case, armed with bear spray and a pocket knife — including by stopping to "t[ake] a video of a woman banging on [a]

10

window," blowing past deployments to clear the area, and then following the group that pushed

through the Senate Wing Door, the two disrupted the certification of the electoral votes.  See

Tr. II at 167–69.  Just as with the lookout above, their conduct might be innocent enough if they

had acted alone, but that is not what occurred on January 6.

Although Ballenger and Price list a litany of constitutional complaints with this

reasoning, they do not develop them.  See Acquittal Mot. at 19 (stating that Court's finding

"offends all notions of Separation of Powers, First Amendment rights of assembly, Fifth

Amendment Due Process, Fifth Amendment Vagueness, and Sixth Amendment rights"); id. at 21

(quoting United States v. Lanier, 520 U.S. 259, 266–67 (1997), without more).  Given the

Court's individualized finding of guilt, Defendants' invocation of Scales v. United States, 367

U.S. 203 (1961), leads nowhere.  See id. at 225 (explaining that Fifth Amendment requirement of

"personal guilt" does not "put[] beyond the reach of the criminal law all individual associational

relationships"); Acquittal Mot. at 20–21 (quoting Scales with no analysis).  Considering the long

list of decisions in this district rejecting overbreadth and vagueness challenges to the "disruptive

conduct" provision, Defendants' First Amendment argument is equally unsuccessful.  See United

States v. GossJankowski, No. 21-123, 2023 WL 130817, at *7 (D.D.C. Jan. 9, 2023) (surveying

cases).

### 2.  *Intent to Disrupt*

Without acknowledging the forest of evidence that they intended to disrupt congressional

proceedings on January 6, Defendants fixate on two trees.  They argue first that they were not

aware that the loud noises they heard coming from the Capitol were flash bangs, see Acquittal

Mot. at 39–40, and second, that the Court would have found three of their communications to

reflect sarcasm if the emojis included in them had been admitted.  Id. at 40–41; Tr. II at 3–4 (parties representing that only three messages in the exhibits omitted emojis).

As to the first, the evidence that Defendants heard flash bangs, while amply supported, see Tr. II at 91 (Ballenger admitting to hearing a loud sound), was not necessary to the Court's verdict, id. 168–69 (listing hearing flash bangs as one of nine observations of disruption).  As to the second, no credible evidence supports the argument that the three messages from which emojis were omitted were meant to be sarcastic.  See, e.g., id. at 116 (Prosecutor: "How do you know th[e emojis] were supposed to indicate ['we stormed the Capitol'] wasn't a serious statement?"  Ballenger:  "Because I know it wasn't a serious statement.").  Nor would any sarcastic messages make a dent in the myriad communications displaying Defendants' intent to disrupt congressional proceedings that day.  See, e.g., id. at 72, 167 (Ballenger: "[T]he time has come.  It's January 6!!!"); id. at 119, 168 (Price: "[W]e're just taking over the Capitol.").

3.  *In Fact Impeding or Disrupting*

Defendants last argue that their conduct did not "in fact, impede[] or disrupt[] the orderly conduct of Government business or official functions," 18 U.S.C. § 1752(a)(2), because the electoral certification was "already suspended" before they crossed the grounds and entered the Capitol.  See Acquittal Mot. at 28.  They cite to a different January 6 trial in which Judge Trevor McFadden found that a defendant's "presence alone in fact did" not "disrupt the proceedings," which "had been halted well before he entered the Capitol building."  United States v. Martin, No. 21-394, ECF No. 41 at 270 (D.D.C. Apr. 6, 2022).

"Even the presence of one unauthorized person in the Capitol," however, can be "reason to suspend" — and to extend the suspension of — "Congressional proceedings."  Rivera, 607 F. Supp. 3d at 9; see also Bingert, 2023 WL 3613237, at *6 (finding § 1752(a)(2) violation where

defendants "impeded the ability for law enforcement to regain control of the area").  In this case, regardless of precisely when the proceedings were halted, the Court found that "Congress was not able to reconvene while the rioters," including Defendants, were in and around the Senate Wing.  See Tr. II at 167; Tr. I at 48 (Captain Baboulis: "[A]ny individual could present a threat. We had no idea of who was there, what they were in possession of.").  No more is required.

Ballenger and Price also resort to the rule of lenity and to the requirement that courts construe results-based statutory elements to require but-for causation.  See Acquittal Mot. at 29–30; Bittner v. United States, 143 S. Ct. 713, 724–25 (2023) (describing rule of lenity); Burrage v. United States, 571 U.S. 204, 210 (2014) ("When a crime requires not merely conduct but also a specified result of conduct, a defendant generally may not be convicted unless his conduct is both (1) the actual cause, and (2) the legal cause (often called the proximate cause) of the result.") (internal quotation marks and citation omitted).  The upshot, Defendants argue, is that a conviction under § 1752(a)(2) requires that Government business would not have been impeded or disrupted but for their individual conduct.

Judge Kollar-Kotelly has considered and rejected that argument, explaining that the text of § 1752(a)(2) contains "no language that would suggest but-for causation, such as 'results from' or 'because of.'"  Rivera, 607 F. Supp. 3d at 9 n.15; cf. United States v. Rhine, No. 21-687, 2023 WL 2072450, at *6 (D.D.C. Feb. 17, 2023) ("[T]he presence of other sufficient causes of congressional disruption does not defeat liability under § 1752(a)[(2)].").  The Court is inclined to hew to that analysis (which Defendants have not addressed) and declines to adopt their argument that the statutory phrase "in fact" suggests but-for causation.  That term requires at most that Defendants' conduct actually disrupt the proceedings, not that the disruption be traceable solely to them.  See In Fact, Black's Law Dictionary (8th ed. 2004) ("Actual or real;

resulting from the acts of parties rather than by operation of law").  Indeed, under Defendants'

reasoning, no one individual who participated in the riot on January 6 could ever be prosecuted

for this offense.  The actual-causation gloss <u>Burrage</u> calls for need not apply where, as in this

case, "[t]he open-endedness of the statutory language allows" the "adoption of a demanding but

still practicable causal standard."  <u>Maslenjak v. United States</u>, 582 U.S. 335, 351 (2017).

      C.    <u>Count III: Disorderly or Disruptive Conduct in a Capitol Building or Grounds</u>

Count Three relies on 40 U.S.C. §5104(e)(2)(D), which prohibits "willfully and

knowingly . . . utter[ing] loud, threatening, or abusive language, or engag[ing] in disorderly or

disruptive conduct, at any place in the Grounds or in any of the Capitol Buildings with the intent

to impede, disrupt, or disturb the orderly conduct of a session of Congress."  With respect to this

count, the Court found that Defendants "engaged in [] disruptive conduct for the reasons [it] set

forth" in its discussion of Count Two.  <u>See</u> Tr. II at 172.  It focused for this count on the building

rather than the grounds, <u>id.</u> ("Count 3 relates just to the building, not the grounds."), and found

that Defendants acted "with the intent to impede by entering the building."  <u>Id.</u>  It added that

"again, they would not be guilty if they had acted by themselves.  But, of course, you can't go

into that Senate Wing Door by yourself because it's not open during normal circumstances."  <u>Id.</u>

(capitalization modified).  Defendants' Motion challenges the Court's findings that they engaged

in disruptive conduct and that they did so willfully.  <u>See</u> Acquittal Mot. at 18, 38.  The Court will

address each in turn.

      1.  *Disruptive Conduct*

Defendants mostly rehash their arguments with respect to Count Two.  They do,

however, separately maintain that § 5104(e)(2)(D)'s "disorderly or disruptive conduct" provision

must target only that conduct that reaches beyond merely entering and remaining in the building.

<u>See</u> Acquittal Mot. at 18.  They further argue that "disorderly or disruptive conduct" in this

provision must be read in context with the clause that precedes it, which prohibits "utter[ing] loud, threatening, or abusive language." See id.; Rhine, 2023 WL 372044, at *13.

Defendants are guilty of violating § 5104(e)(2)(D) not merely because they entered and remained in the Capitol building.  They did so together with, and thereby further strengthened and encouraged, a throng of rioters.  See United States v. MacAndrew, No. 21-730, 2023 WL 196132, at *3, *8 (D.D.C. Jan. 17, 2023) (finding "supportive, though noncombative, member of the riot" who spent a few minutes in Capitol guilty of violating § 5104(e)(2)(D)).  The same conduct that violates § 1752(a)(2) also violates § 5104(e)(2)(D), and Defendants agree that the term "disruptive" should be defined the same way in both statutes.  See Joint Elements at 6 (agreeing with Government that § 5104(e)(2)(D)'s reference to "'disorderly or disruptive conduct' should have the same meaning as the instruction for Count Two"); Acquittal Mot. at 18 (again equating disruptive with disorderly conduct).

For the reasons explained in Section III.B, *supra*, a reasonable factfinder could find Defendants guilty of disruptive conduct in a Capitol building.

2. *Knowingly and Willfully*

This count, unlike Count Two, requires that Defendants acted not only knowingly, but also "willfully."  United States v. Baez, No. 21-507, 2023 WL 3846169, at *3 (D.D.C. June 2, 2023).  "[A] person acts willfully when [she] act[s] with knowledge that [her] conduct was unlawful."  United States v. Grider, No. 21-22, 2022 WL 17829149, at *14 (D.D.C. Dec. 21, 2022) (internal quotation marks and citation omitted).  The sheer number of barriers coupled with the substantial police presence that Defendants observed that day should have made eminently clear to any reasonable person that her breaching the Capitol and supporting other rioters was not merely discouraged, but unlawful.  See, e.g., Griffith, 2023 WL 3477249, at *6

15

(finding defendant acted willfully where he "knew his presence around and in the Capitol was unauthorized[] and that his continued presence was disruptive").  Defendants challenge this finding with the same arguments the Court rejected in its *mens rea* analysis for Count Two, and those arguments garner no better results here.  See Acquittal Mot. at 38–39.

>        D.        Count IV: Parading, Demonstrating, or Picketing in a Capitol Building

Count Four invokes 40 U.S.C. § 5104(e)(2)(G), which prohibits "willfully and knowingly . . . parad[ing], demonstrat[ing], or picket[ing] in any of the Capitol Buildings."  As to this count, the Court explained that "if [Defendants] had acted by themselves in a tourist area, they might well not be guilty.  But again, . . . what this was, to put it mildly, was a mass demonstration, to put it more accurately, probably it was an insurrection, but their knowingly being part of this demonstration by being in the building as part of this group means they violated" § 5104(e)(2)(G).  See Tr. II at 172–73.

Defendants argue that while they were in the Capitol building, they "walked briefly, stood in line, took pictures and texted," and were not "part of any group," and that this conduct could not have constituted parading, demonstrating, or picketing, in part because they were not "connect[ed] . . . to a specific organized effort in the Capitol buildings."  Acquittal Mot. at 25–28.  Before trial, both parties agreed that "parade" and "picket" carry their ordinary meanings, and Defendants proposed that "demonstrate" be read to refer only to "outwardly demonstrative conduct" that is "itself[] disruptive of the orderly business of Congress" and excludes "ordinary activities at a Capitol building such as peacefully walking."  Joint Elements at 8–9.  Even under their own proposed definitions, Defendants both paraded and demonstrated inside the Capitol, either of which is sufficient to sustain their conviction here.

### 1. *Parading*

To parade can in ordinary parlance mean "[t]o march in procession or with great display or ostentation" or "to walk up and down, promenade, *etc.*, in a public place, esp[ecially] in order to be seen." United States v. Nassif, 628 F. Supp. 3d 169, 183 n.7 (D.D.C. 2022) (quoting Parade, Oxford English Dictionary (3d ed. 2005)) (formatting modified). Defendants marched through a breached doorway and then through the Senate Wing foyer, together with a large group — to summarize in Price's words, they "stormed the Capitol." Tr. II at 169. Even if that is exaggeration, their joining and remaining in the building with others who had broken into the Capitol is not "peaceful[] walking," Joint Elements at 9, and it constitutes parading in the Capitol building.

### 2. *Demonstrating*

Even if Defendants did not parade, they certainly demonstrated. Although Price and Ballenger spill much ink on the argument that § 5104(e)(2)(G) should not be read to impute the actions of others onto them, see, e.g., Acquittal Mot. at 27 (quoting definition of "demonstration" in unrelated statute), ample evidence supports the Court's individualized finding that Defendants engaged in a demonstration.

As Judge John Bates explained in Nassif, dictionary definitions of "demonstrate" make "clear that § 5104(e)(2)(G) prohibits taking part in an organized demonstration or parade that advocates a particular viewpoint — such as, for example, the view that the 2020 U.S. Presidential Election was in some way flawed." 628 F. Supp. 3d at 183; see also id. (quoting Oxford English Dictionary definition of a "demonstration" as "protest[ing] against or agitat[ing] for something") (internal quotation marks and citation omitted). That is the conduct Defendants engaged in.

They nonetheless maintain their analogy to Martin, in which Judge McFadden found that a defendant who engaged in conduct similar to Ballenger and Price in the Capitol building was not guilty of violating 40 U.S.C. § 5104(e)(2)(G).  See Martin, ECF No. 41 at 271.  That defendant, however, according to Judge McFadden, encountered "a very different situation" at the Capitol rotunda, where he entered and remained, "than the situation that largely unfolded on the other side of the Capitol building" — i.e., the Senate Wing.  Id. at 264; see also id. at 261 ("[A] reasonable person could believe officers were allowing people to gather on the central stairs, but not the Senate stairs.").  Even were this Court to subscribe to Judge McFadden's conclusion, Ballenger and Price entered through the Senate Wing Door alongside a group of protesters facing a police cordon, see Tr. II at 167, expressly associated themselves with that group (Ballenger, for example, testified that she and other rioters were "gathered together in support of the country," id. at 36), identified with its political cause (Ballenger carried a pro-Trump flag with her), and recorded the violence they observed.  See id. at 37, 168–69.  A reasonable factfinder would have no trouble finding that conduct a demonstration.  See Rivera, 607 F. Supp. 3d at 6, 10 (finding defendant who livestreamed and shouted slogans but did not cross police cordon still "went further than mere presence in a demonstration").

Defendants propose adding a requirement that conduct be disruptive in order to qualify as a demonstration.  See Acquittal Mot. at 26.  The Government counters that "mere presence in a protest, along with other words or conduct that ratify interest in demonstrating, is demonstrating."  ECF No. 112 (Gov't Opp.) at 11 (quoting Rivera, 607 F. Supp. 3d at 10 n.16).  The Court need not go so far, as it has already found that Defendants' actions (including their armed walk through the Capitol building) exceeded mere presence.  See Section III.B.1, supra.  Defendants both paraded and demonstrated in the Capitol.

18

E.    <u>Motion for New Trial</u>

As an alternative to acquittal, Defendants present five arguments as to why they should receive a new trial.  <u>See</u> Mot. New Trial.  The Court examines each, grouping them as appropriate.

1.  *Imputing Group Conduct*

They first argue that the Court improperly incorporated the word "mob" into its analysis for Counts Two through Four even though that word did not appear in the parties' Joint Proposed Elements for those counts.  <u>See</u> Mot. New Trial at 1, 2, 4.  This, they argue, violated their Fifth and Sixth Amendment rights because it deprived them of the opportunity to prepare for a trial in which the conduct of others would be relevant to their criminal liability.  <u>See id.</u> at 2.  As the Court has explained in detail above with respect to each count, it did not impute the conduct of others present at the Capitol that day to Defendants.

Ballenger and Price also raise a related procedural complaint.  They argue that since the parties' Joint Proposed Elements contained points of disagreement, the Court should have provided a "resolution before the trial" or "before closing statements" on the appropriate instructions.  <u>Id.</u> at 3; Fed. R. Crim. P. 30(b) ("The court must inform the parties before closing arguments how it intends to rule on the requested instructions.").  The Court made clear at trial that it had received and considered Defendants' proposed instructions and their Memorandum in support of their proposals.  <u>See</u> Tr. II at 4–5 (confirming receipt).  At no point did Defendants request a ruling on the proposed instructions, let alone explain why one would be necessary in this bench trial.  <u>See</u> <u>Shepard v. United States</u>, 544 U.S. 13, 20 (2005) ("In cases tried without a jury, the closest analogs to jury instructions would be a bench-trial judge's formal rulings of law and findings of fact . . . .").  Defendants do not explain, furthermore, why that procedural decision constituted "a serious miscarriage of justice" warranting a new trial.  <u>See</u> <u>Wheeler</u>, 753

F.3d at 208.  Nor could they: the Court offered the parties an opportunity to answer questions about both sets of proposed instructions throughout closing argument, see, e.g., Tr. II at 149 (asking about Defendants' proposal); id. at 164 (acknowledging differing proposals), and it has again considered Defendants' proposals throughout this Opinion.  That procedural approach does not warrant a new trial.

### 2.  *Reliance on Exhibits Containing Facebook Content*

Defendants next argue that the Government "violated the terms of a Facebook search warrant and included exhibits in violation of that Warrant" at trial.  See Mot. New Trial at 2. Although their precise argument eludes the Court, they appear to take issue with a set of Government exhibits (308A, 308B, and 309A) that contain content obtained from Facebook. The argument appears to be that these exhibits contain so much content that the Government must have reached beyond the terms of the search warrant, which required it to filter and retain only relevant content.  See ECF No. 85-1 (Search Warrant) at 5 (describing filtering requirement).

In advancing a third and related basis for a new trial, Defendants further argue that the Government violated its Brady obligations to provide them with exculpatory evidence.  See Brady v. Maryland, 373 U.S. 83 (1963); Mot. New Trial at 9–10.  Specifically, they argue that "the government tried to state Cynthia Price was sympathetic to" an article that contemplated executing then-Vice President Pence "when the Government had Brady material buried in a 14,637 page Facebook document that states the opposite."  Mot. New Trial at 2.

Even if these underdeveloped allegations held water, no miscarriage of justice would have occurred.  At trial, Defendants did not object to the admission of any of the three exhibits they now express concerns with.  See Tr. I at 115–116 (admitting exhibits without objection).

Neither the Government nor the Court heavily relied on them.  During cross-examination, the Government referred only to Exhibit 308B, and only to question Ballenger about Facebook exchanges in which she shared the article that contemplated executing Pence.  See Tr. II at 81–82.  Although Ballenger's evasive responses during that exchange contributed to the Court's finding that she was not credible, see id. at 170 (referring to this exchange), they were hardly necessary to that credibility determination (which resulted from Ballenger's multiple mischaracterizations and evasive answers on the stand), let alone to the Court's determination of intent.

3.  *Reliance on Evidence of Tear Gas and Statements Omitting Emojis*

Defendants lodge their fourth challenge to the Court's finding that Defendants encountered tear gas at the Capitol, and their fifth to its consideration of exhibits that displayed their written exchanges but omitted emojis those exchanges contained.  See Mot. New Trial at 3, 11–12.  As the Court explained in Section III.A.2, *supra*, the evidence admitted at trial supports its tear-gas finding and its interpretation of Defendants' written exchanges.  Exclusion of such evidence, moreover, would not have altered the Court's result.  A new trial is not warranted.

IV.    **Conclusion**

For these reasons, the Court will deny Defendants' Motion for Acquittal and their Motion for a New Trial.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  July 18, 2023