**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**CYNTHIA BALLENGER, and**<br>**CHRISTOPHER PRICE,**<br><br>                      **Defendants.** | **Case No. 1:21-cr-00719 (JEB)** |

**DEFENDANT CHRISTOPHER PRICE'S MEMORANDUM IN AID OF SENTENCING**

### I.      Summary

Comes now by and through undersigned counsel file Defendants' Christopher Price respectfully submits this sentencing memorandum portions of which are referred to the memorandum in aid of settings for Cynthia Ballenger (Price). The trial included both defendants. The defendants were convicted of 4 misdemeanor Counts[1] but as discussed below the same, limited offense conduct effectively forms the basis for all counts. The offense conduct, for each the of charges in this case, is the act of "entering" the foyer by the Senate Wing door of the U.S. Capitol, and, in addition, for Count 2, the Court noted "being" on the West Terrace.  The Prices went south inside the Senate Wing door and then, like everyone else at the time, as shown in the government closed circuit video (CCV), turned to get in line to exit.  The time going south was about a minute and within 2 minutes they were in line to exit headed to go out.  The walk south was peaceful and

---

[1] Count 1 is a violation of 18 U.S.C.§1752(a)(1). Count 2 is a violation of 18 U.S.C.§1752(a)(2). Count 3 is a violation of 40 U.S.C. §5104(e)(2)(D). Count 4 is a violation of 40 U.S.C. §5104(e)(2)(G).

the time in line was civil and peaceful. Neither defendant waived a flag nor shouted nor chanted nor displayed any politically expressive conduct to anyone there.  There is no evidence that the defendants did anything while on the Northwest Terrace or West Terrace.  They observed, peacefully walked, stood and took pictures or video.   At no time is there evidence that defendants ever disobey an instruction from a police officer.

The Defense argues that, based on the actual offense conduct and all other factors, the sentence should be in the lowest, possible tier.  As stated by the court:

> What's sort of interesting about this whole trial is that I agree with you, Mr. Kenkeremath, that on the spectrum of conduct that I have seen, and I have seen a lot, that your clients definitely fall on the lower end.  And that's sort of relevant, certainly for a sentencing analysis…. Trial Tr., March 21, 2023 at 165.

Earlier in the trial the Court had stated:

> Okay. I think you make some interesting points.  And I think certainly the defendants' conduct here in the Capitol is considerably less offensive than most people given their time in there. Trial Tr., March 21, 2023 at 30.

As discussed below, the specific video that catches every second of the Defendant's conduct in the foyer of the Senate Wing Door and the trial transcript is even more clear that the only conduct is peacefully walking for about a minute and then waiting in line to exit for 5 and ½ minutes after police say to go no further.

## II.     Relationship of Memoranda

Due to common elements, the Memoranda in Aid of Sentencing for Cynthia Ballenger (Price) will largely incorporate by reference blocks of the discussion in the instant memorandum. The blocks effectively shared by Christopher and Cynthia include: I. Summary & Outline; II. Legal

Standard; III. Offense Conduct and Statement of Objection to PSR Statement of Offense Conduct;

IV, The Office Conduct Is Properly in Zone A; and the Need for Unwarranted Disparities.

Christopher has a small additional discussion in the sentencing guidelines section concerning

application of U.S.S.G 1B1.13 as potentially related to the very recent and very bad news of the

recurrence of his prostate cancer and treatment.  A substantial amount of the memorandum in aid

of Sentencing for Cynthia Price is devoted to challenging both the inappropriate proposed

adjustment under U.S.S.G 3.C.1. Christopher and Cynthia have separate sections on

By minute order of July 24, 2023, the Court ORDERS that Defendants' 128 Motion is GRANTED

inasmuch as they may include whatever objections they like in their Sentencing Memoranda. So

ORDERED, by Chief Judge James E. Boasberg on 7/24/2023. (nbn).  As an attachment to this

memorandum in Aid of Sentencing both Christopher Price and Cynthia Price set out additional

objections beyond those found in the body of this memorandum.

## III.   Recommendation

The Defense recommends a sentence of 1-year probation and $500 restitution for each

Defendant.  Should the Court find this insufficient, the Defense recommends either adding a

modest additional fine of $500 to $1000, or a short term of home detention between 10 to 30 days.

If the Court should find this insufficient the recommends the Court add community service

between 30 to 60 hours.

## IV.   Legal Standard

After *United States v. Booker*, 543 U.S. 220 (2005), sentencing courts must exercise their

discretion to impose sentences that are "reasonable" when viewed in light of the purposes of

federal sentencing -- retribution, deterrence, incapacitation and rehabilitation.  The Supreme

Court states "[o]ur remedial opinion in *Booker* invalidated two offending provisions in the

[Sentencing Reform Act of 1984] , see *id.,* at 245, 125 S.Ct.738 (invalidating 18 U.S.C. §§ 3553(b)(1), 3742(e), 3742(e)), and instructed the district courts to treat the Guidelines as "effectively advisory," 543 U.S. at 245.   *Pepper v. U.S.*, 562 U.S. 476, 489-490 (2011). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam).  "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Id.* (emphases in original).  S*ee also Kimbrough v. United States*, 552 U.S. 85, 110 (2007). In addition, the Court has the ability to impose a downward sentence and it will be upheld unless "it is unreasonable, even if the sentence would not have been the choice of the appellate court." *United States v. Evans*, 526 F.3d 155, 160 (4th Cir. 2008).

The "overarching instruction" of 18 U.S.C. § 3553(a) is to "'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing."  (emphasis added) *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007).  §3553(a) lists six goals of sentencing: "to reflect the seriousness of the offense," "to promote respect for the law," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," "to protect the public from further crimes of the defendant," and to provide the defendant with needed" training, medical care, or treatment.  18 U.S.C. § 3553(a)(2).  To achieve those goals, sentencing courts must consider several factors, including the nature and circumstances of the offense," "the history and characteristics of the defendant," "the [guideline] range," "any pertinent policy statements," and "the need to avoid unwarranted sentence disparities among defendants." *Id*. Punishment must "suit not merely the offense but the individual defendant." *Pepper* at 488 *v.* (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

Among other items, under Federal Rule of Criminal Procedure § 32 (f) (3)(B) the Court "must—for any disputed portion of the presentence report or other controverted matter—rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in the sentencing. Under Federal Rule of Criminal Procedure § 32(f)(3)(C) the court must append a copy of the court's determinations under this rule to any copy of the presentence report made available to the Bureau of Prisons.

### V.      The Actual Offense Conduct Identified by The Court and Based on Evidence Is Very, Very Limited and Minimal

In addition, to argument in the main body of the instant memoranda, this section is part of the objection to issues in the PSRs.

#### A.   *The Offense Conduct Identified by the Court in the Instant Case, for All Counts, is "Entering" or "Being" In a Location with Others; There is No Other Disorderly or Disruptive or Demonstrative Conduct*

As Justice Breyer wrote for the Supreme Court in *Booker*, "Congress' basic statutory goal—a system that diminishes sentencing disparity—depends for its success upon judicial efforts to determine, and to base punishment upon, the **real conduct** that underlies the crime of conviction." *Booker* at 250 (2005) (emphasis added).

According to the Court, the conduct under Count 1 is entering the Capitol building. Trial Tr., March 21, 2023, at 171: 12-16. For Count 2 the Court effectively found the same basic conduct -- entering or "being" at a location. Specifically, the Court found the act of "going into the Capitol" (*Id*. at 172: 4) and "being" on the Upper West Terrace (*Id.* at 172:5) was the "*actus reus*" of "disorderly or disruptive conduct" for Count 2.   For Count 3 the Court effectively found the same conduct that formed the basis for count 1 and Count 2 was the basis for Count 3.

5

Specifically, the Court found the act of "entering the building" was the *actus reus* of "disorderly or disruptive" conduct for Count 3.  *Id*. at 172:12-13.

 To be clear there is no other "conduct" of the Cynthia Price (Ballenger) or Christopher Price that forms the basis for the finding of "disorderly" or disruptive conduct" under Count 2 or 3.  The Court talks at various points about the conduct inside the foyer.  For example, the Court states:

> And the government generally agreed that if this conduct had taken place in a vacuum it might not well be disruptive. *Id.* at 171:23.

> And again, they would not be guilty if they had acted by themselves. *Id.* at 172:17.

> Similarly, in relation to Count 4 the Court stated:

> Isn't that your best argument, that the activities they took inside the building, if they had been by themselves, would you agree, likely would not satisfy the demonstrate prong since it seems like they were largely peacefully walking, standing, texting or taking pictures? *Id.* at 140:24-15.

The *actus reus* under Count 4, like the basic issues under Counts 1-3, was being in the foyer inside the Senate Wing Door. The Court stated no specific demonstrative conduct—just presence.

 Indeed, there is no evidence that the Prices did anything other than peacefully walk, stand in line to exit, take pictures and, for Christopher Price, text, while in the Foyer of the Senate Wing Door.  Defense Counsel asked related questions of Special Agent Belcher at Trial Tr. 3/20/2023 at 181:

Q: …it seems like the Prices walk in, get in line, and walk out.  Is there is something different that you found in your investigation?

A: No.

Q: And in your investigation, did you investigate anything outside of the Senate Wing Door.  That is to say, in the area outside of it, were you able to talk to anyone or you, ask what the situation looked like there?

A: No.

Lt. Grossi never referred to the Prices in testimony and there is no indication he saw them in the foyer.  Lt. Grossi was forced to admit **no one** was pushing or challenging anyone while the Prices were in the foyer. Trial Tr. 3/20/2023 at 88-91 and that the actual police cordon was being highly effective in preventing people from going north Id. at 90. Lt. Grossi had no information about what was outside of the Senate Wing Door. Id. at 90.   Captain Baboloulis had neither testimony regarding the Prices in the Capitol nor outside the Senate Wing door.

The Defense provided timing specifics when showing the video of the Prices at the Senate Wing door and inside the foyer, Def. Exhibits 200 (government video) and 400 (government video with identifying circles) and Defense Exhibit 303 (screenshots with time stamps and circles highlighting the Prices) .  The steps and sequence are important and must be stated accurately, fully and fairly.

 The evidence shows the Prices walk through an open Senate door at about 3:22:44 pm. Defense Exhibits 200, 303, 400; Government Exhibit 202D, 703. There is no evidence this door was closed at the time the Prices were on the West Terrace.   At the time of entry there is no

indication or evidence that any of the police officers inside, but near the door, tells the Prices not to enter.  This point, specifically, compares to evidence in Defense Exhibit 201 where a police officer does go to the door and, using hand motions, indicates to people not to enter anymore. These motions are after the Prices have left the foyer to exit. After the policeman actually motions for people not to enter, no one does enter. The government never established that anyone present at the time of the Prices disobeyed a direction of a policeman.

Around 3:15 pm, the police could have simply put one or two police officers outside the Senate wing door who informed people (fair notice) instead of standing inside and no one would have entered.  The Prices would not have entered.  Or an officer at the door could have stated to people not to enter as was the case after the Prices left.  On that failure of the police, the Court nonetheless convicts the Prices as criminals on 4 charges.

The Prices walked south after entering and took a picture of a police officer at 3:23:24 pm, about 44 sec after entering. Defense Exhibits 303 page 2. The picture is of an officer with the name A. Tax. on the front of his shirt. The location is only slightly passed the foyer and a bit into the gray hallway south.

That picture is also in Gov't Exhibit 107M. The evidence shows the Prices never went farther south than this person and turned around shortly after that picture to peacefully stand in line to exit.  Before 3:24:15 pm, about 1:35 seconds after entering, both Cynthia and Christopher are facing in line to exit. Defense Exhibits 303 page 3. This means the Prices spent about 5 remaining minutes of their 6 ½ minutes in the Capitol waiting in line to exit.  Defense Exhibits 200, 303, 400 and Government Exhibit 202D specifically show there is a line of people that pass by a line of police officers on the way out.  No one jumps the line.  The line is entirely civil.

Many citizens have ordinary conversations with the officers—antithetical to any claim of any pushing or antagonism with the police at the time the Prices were in the foyer.

Once the Prices were in line to exit, there was nothing they could do but proceed through that line to exit. They did take pictures and Chris Price texted while in this line to exit. There is no evidence that taking pictures or texting delayed their exit or disrupted anything. The evidence is simply that the bottleneck at the front of the exit line controlled the timing of exit. Some of that bottleneck was simply citizens conversing with the police officers. The evidence shows Cynthia and Chris exit the foyer at about 3:29:02 pm. Defense Exhibits 303 page 13.

There is no evidence that the Prices disobeyed any order of a policeman, broke anything, assaulted anyone, touched anything, or spoke above a volume normal to private conversation. Dictionary.com describes the primary meaning of "conduct" as personal behavior; way of acting; bearing or deportment. https://www.dictionary.com/browse/conduct. There is nothing concerning the Prices conduct except peacefully walking, standing in line to exit, taking pictures and texting.

Government Counsel stated, in part:

> …And so I take Your Honor's point that it might be different under the particular this statute if this weren't January 6 and the defendants didn't intentionally join a mob and they didn't enter into the building with a group of people intentionally, but they did. And our argument here is that that conduct is sufficient to establish this element. Trial Tr., March 21, 2023, at 141: 5-10.

Again, the conduct is entering with others.  The government may call this "joining a mob." Neither the government nor the Court have ever explained the legal standard or evidence behind the "joining" or "mob." Regardless, the actual individual conduct of the Prices is clear and on video.

Note also the point made by the government that the *actus reus*, the act must be voluntary. The Government's Opposition to Defendants' Motion for New Trial and Renewed Motion for Judgment of Acquittal ("Gov't Opp.")[ECF 112]  footnote 3.  The Prices got in line to exit after a very short time.  The time it takes to exit was not voluntarily "remaining".  The Prices were fulfilling the ordinary convention of civilized behavior by standing in line to exit and not trying to push their way out.  It was not feasible or reasonable to create a separate line to exit or turn on the spot and walk in the opposite direction, because that would involve pushing. There is nothing disorderly or disruptive about peacefully standing in line to exit in any setting in America, including on January 6, 2021.

### B. *Defendants' Conduct with Police, And Anyone Else, Was Always Respectful and Polite*

The Prices have always been respectful of police and never disobeyed any instruction on January 6, 2021. This is an important point relevant to the statement of offense and the application of guidelines. There is simply no evidence that the Prices would have entered the Senate Wing Door of a single officer told them not to.  The evidence is that the Prices followed instruction to not go further South that where officer A. Tax stood, just like everyone else who entered during the time the Prices were in the foyer.  The one time a person shouted something disrespectful to a police officer, Cynthia said "he's just doing his job." Trial Tr., March 20, 2023 at 173 There is no evidence the Prices in any way obstructed an officer from doing anything or failed or would fail to follow an instruction.

This was further illustrated in the trial in Defense Exhibit video 201 where a police officer did make hand gestures indicating not to enter.  This was after the Prices left, but no one entered upon the simple direction of that officer.

**VI.     The Prices Conduct Under the Sentencing Guidelines Is Properly in Zone A**

In addition, to argument in the main body of the instant memoranda, this section is part of the objection to issues in the PSRs.

**A.     *The Base Offense Level Should Be 6 Points and Based on USSG §2B2.3 And Not USSG §2A2.4***

The question whether §2A2.4 or §2B2.3 is the Guideline provision applicable to that statute has been contested and decided in favor of §2B2.3  by the Court in *United States v. Brodnax,* No. 21-cr-350-PLF (D.D.C.  July 12, 2022) [Exh. A hereto] at 91 under the facts of that case.  In *Brodnax*, Judge Friedman held that although nearly every January 6 defendant convicted under §1752(a)(2) has agreed to the application of U.S.S.G. §2A2.4, "as a matter of law, that's wrong."  *Id.* at 100. The Sentencing Guidelines' Statutory Index identifies two Chapter Two Guideline provisions as applicable to violations of 18 U.S.C. §1752: §2A2.4 and §2B2.3.  As the Guidelines state, this occurs when a "particular statute … proscribes a variety of conduct that might constitute the subject of different offense guidelines," and requires the sentencing court determine which of the provisions is "most appropriate for the offense conduct charged in the count of which the defendant was convicted." U.S.S.G. §1B1.2 cmt. 1.

Judge Friedman adopted the interpretation that 18 United States Code, Section 1752 has in subpart A, five subsections, any of which can be charged as a criminal offense depending on the facts and circumstances. Id at 91: 16-18.

[The Defense counsel] stated  §2A2.4 requires some sort of action against a government official, and among other things, she points to application note 2 to  §2A2.4 which says the base offense level incorporates the fact that the victim was a governmental officer performing official duties. … He had no physical contact with any officer.  He didn't even yell at an officer so far as the evidence shows, and therefore, it's more like trespass. Id at 98: 4-9…

She points out that there are victims identified, people identified in other subsections of 1752, 1752(a)(4), for example, but not here…. So that's sort of the question.  Is this more like a trespass or is it obstructing or impeding and officer? I conclude that the appropriate guideline for a violation of 1752(A)(2) is 2B2.3, trespass.  Id. at 94:7-13.

…[a] violation of 18 U.S.C. 1752(a)(2) does not turn on any activity directed towards individuals.  And in this case, there is no evidence that Mr. Brodnax impeded or obstructed any government official.  Other people on January 6 clearly did.  He did not. *Id. at lines 15-20.*

Judge Friedman noted that an evaluation showed that the relevant language to which 2A2.4 typically applied was directed at a person. Id at 95.  But here, Mr. Brodnax's conviction on Count 2 did not directly involve obstructing, impeding, or interfering with law enforcement. Id at 96:17-18.

There are other defendants in the January 6 cases who are charged with things that allege conduct towards an individual, assaults on police officers, throwing things at police officers, pushing people, throwing fire extinguishers or guardrails into police officers, destroying property.  Mr. Brodnax is not. Id at 97:23-25, 98:1-3.

12

So despite the government's argument, it seems to me that not every instance of the disruption of the governmental function involves obstructing or impeding an officer. As I said, and as Ms. Maguire said in her argument, 18, U.S.C. § 1752(a)(2).  Id at lines 22-25.

And the right answer is to apply the trespass statute to a violation of 1752(a)(2), that is, guideline 2b2.3, which as a base offense level of 4.  Judge Friedman then added the 2-point enhancement for a restricted area to get a base offense level of 6. Id. At 100.

The Sentencing Guidelines provide that a defendant convicted of an 18 U.S.C. § 1752 offense is subject to either U.S.S.G. § 2B2.3, which is entitled "Trespass" or U.S.S.G. § 2A2.4, which is titled "Obstructing or Impeding Officers," *See* U.S.S.G., App. A.  Nowhere in the sentencing guidelines does it state that U.S.S.G. § 2A2.4 must apply to violations of 18 U.S.C. § 1752 (a)(2). Indeed, 18 U.S.C. § 1752 involves a broad range of charges and potential penalties. For example, 18 U.S.C. § 1752 (a)(4) is "knowingly engages in any act of physical violence against any person or property in any restricted building or grounds."  Under 18 U.S.C. § 1752 (b)(1) maximum penalties and the nature of the offense can be modified by whether a defendant uses or carries a deadly or dangerous weapon or firearm or the offense results in significant bodily injury.  If 18 U.S.C. § 1752 (b)(1) is satisfied the maximum is 10 years whereas if only 18 U.S.C. § 1752 (b)(2) is satisfied the statutory limit is 1 year.  That is a very dramatic scale up of penalties. What is also clear is the statutory maximum under 18 U.S.C. § 1752 (a)(4), where there is no significant harm is 1 year.  It would not be consistent with the clear statutory maximum to have guidelines force a penalty near the top of the statutory limit for the conduct of the Prices.

Note how §2A2.4 includes a 3-level enhancement if a dangerous weapon (including a firearm) was possessed and its use threatened.  If the victim sustained bodily injury the enhancement is 2 levels.  Each of these enhancements might increase the range by months. Yet the statute would have the statutory maximum increase to 10 years versus 1 year for these features.  Under the range of possible conduct under 18 U.S.C. § 1752 the conduct of the Prices is on the lowest end. Consider that U.S.S.G. § 2A2.3 is Assault which is 4 points.

Application note 2 for U.S.S.G. § 2B2.4 states that the base offense level incorporates the fact that the victim was a government officer performing official duties. The guidelines have several statutes mentioned on under the commentary and then a reference to Appendix A of the Guidelines.  The statutes mentioned in the commentary all involve actions involving actions against a specific person who is performing specific official duties including 18 U.S.C. §§ 111 (Officer or employee of the United States); 18 U.S. Code § 1501 (process server); 18 U.S. Code § 1502 (extradition agent); 18 U.S. Code § 2237(a)(1) (law enforcement officer) 18 U.S. Code § 2237(a)(2)(A) (law enforcement action/resist arrest); 18 U.S. Code § 3056 (d) (Federal law enforcement officer).

Moreover, the government, and the Court in the instant case its findings of law, as discussed in greater length above, below, and in other memorandum have lowered what is "disruptive conduct" – the defense believes in error --under 18 U.S.C. § 1752(a)(2) to be as little as presence in the Capitol with others, without more individual conduct, which is the same as trespass, just with others.

**B.**  ***The Rule of Lenity Applies Given Any Ambiguities Including Regarding the Selection of the Proper Base Level and Adjustments***

Cynthia Price further argues that given any ambiguities, the Rule of Lenity applies. 18 U.S.C. §3553 is a statute that determines criminal penalties. Its application based on the guidelines is ambiguous and the relationship to a complex statute like 18 U.S.C. §1752 also involve fundamental ambiguities. The general application of a 10-point level which elevates the range to 6 to 12 months --- the top of the statutory sentencing range—for anything under 18 U.S.C. §1752 other than violations of 18 U.S.C. §1752 (a)(1) is a contrivance an inherently unreasonable.

The D.C. Circuit also applies the Rule of Lenity to the sentencing guidelines. In *U.S. v. Burke*, 888 F.2d 862 (D.C. Cir. 1989) the court held it was improper to increase the defendant's offense level by two increments without finding he knowingly possessed the gun found in his tote bag. In arriving at this conclusion, the court stated:

> This interpretation of the Guidelines is reinforced by two well-established principles of statutory construction. The first holds that "ambiguities in criminal statutes must be resolved in favor of lenity." *United States v. Batchelder,* 442 U.S. 114, 121, 99 S. Ct. 2198, 2022, 60 L.Ed. 2d 775 (1979). Thus, in the face of any uncertainty over whether section 1B1.3(a)(3) operates to require a showing of scienter under section 2D1.1(b), we are obliged to hold that it does. *Id* at 866.

In the instant case, application of U.S.S.G. § 2A2.4 over U.S.S.G. § 2B2.3 could only be based on resolving several ambiguities against defendants.

Under the *Burke*, the Sentencing guideline question would not be simply whether a defendant obstructed a police officer but that that the defendant knowingly did so. Under *Burke* the court

would need to make independent findings not just that defendant knew she obstructed a particular police officer.  The facts are Cynthia Price never disobeyed a police officer and stood in line to exit when an officer indicated to do so.

This Court must also take notice of the recent Supreme Court case in *Bittner v United States* 143 S. Ct. 713 (2023). The question in *Bittner* was does the Bank Secrecy Act (BSA) penalty provision for non-willful violations accrue on a per-report or a per-account basis.  With respect to the Rule of Lenity the Court stated;

> To the extent doubt persists at this point about the best reading of the BSA, a venerable principle supplies a way to resolve it. Under the rule of lenity, this Court has long held, statutes imposing penalties are to be "construed strictly" against the government and in favor of individuals. (Citing *Commissioner v. Acker*, 361 U. S. 87, 91 (1959)) *Bittner* 143 S. Ct. at 724.

*Bittner* refutes any distinction by statute:

> ….The rule of lenity is not shackled to the Internal Revenue Code or any other chapter of federal statutory law. Instead, as Acker acknowledged, "[t]he law is settled that penal statutes are to be construed strictly," and an individual "is not to be subjected to a penalty unless the words of the statute plainly impose it." [Citation omitted] … Notably, too, Acker cited to and relied on cases applying this same principle to penalty provisions under a wide array of statutes…. *Id*.  [Citations omitted]

*Bittner* must supersede, in critical respect, the prior Supreme Court case of *Barber v. Thomas*, 560 U.S. 474, 130 S. Ct. 2499, 177 L. Ed. 2d 1 (2010) which various courts have cited to for the proposition that the rule of lenity only applies in cases of "grievous ambiguity or

uncertainty".   Instead, the Court is relying on fundamental Constitutional principles that applies where there is "doubt" or even where a statute does not "plainly impose it."

*Bifulco v. United States*, 447 U.S. 381, 387 (1980) also holds that "[The rule of lenity] applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose."  As stated in *Bifulco*:

> ….our examination of the meaning of § 406 must be informed by the policy that the Court has expressed as "the rule of lenity." In past cases the Court has made it clear that this principle of statutory construction applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose. See, *e. g., United States* v. *Batchelder*, 442 U.S. 114, 121 (1979); *Simpson* v. *United States*, 435 U.S. 6, 14-15 (1978). *Id.*

Many courts of appeals, if not all of them, hold that the Guidelines are interpreted just as statutes are.  United States v. Savin, 349 F.3d 27, 35-36 (2d Cir. 2003) (courts interpret the Guidelines just as they do statutes); United States v. Peterson, 629 F.3d 432, 434 (4th Cir. 2011) (same); United States v. Bustillos-Pena, 612 F.3d 863, 868 (5th Cir. 2010) (same); United States v. Bahhur, 200 F.3d 917, 927 (6th Cir. 2000) (same); United States v. Smith, 989 F.3d 575, 586 (7th Cir. 2021) (same); United States v. Collins, 754 F.3d 626, 630 (8th Cir. 2014) (same); United States v. Kirilyuk, 29 F.4th 1128, 1137 (9th Cir. 2022) (same).

**C.**  ***If The Court Does Not Follow Judge Friedman In Selecting* U.S.S.G. § 2B2.3 for a Base Level of 6*, The Court Should Apply a 4-Point Reduction Under U.S.S.G. §3B1.2 Because the Court Statements About 18 U.S.C. §1752(a)(2) Reflects A Joint Offense of Multiple Parties and A Preponderance of the Evidence Shows Defendant's Conduct Was Minimal Related to the Joint Offense***

As detailed within that objection, application of those sections warrants a reduction in offense level for Christopher and Cynthia Price as minimal participants.   U.S.S.G. §3B1.2 states:

Based on defendant's role in the offense, decrease the offense level as follows:

(a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels

(b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels

In cases falling between (a) and (b) decrease by 3 levels.

This guideline is not applicable unless more than one participant was involved in the offense (note 2)

A "participant" is a person who is criminally responsible for the commission of the offense but need not have been convicted.

That the Guidelines already take into account the Prices' lack of criminal history does not mean that it is inappropriate for the Court to vary downward on the same basis.  See United States v. Ransom, 756 F.3d 770, 775 (D.C. Cir. 2014) ("[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines . . . when a district court applies broader § 3553(a) considerations in granting [a sentencing] variance.").

Generally, the Prices contends that, in every case, the proper Guidelines analysis focuses on the defendant's conduct or conduct that satisfies the definition of relevant conduct under U.S.S.G. §1B1.3.  But in the instant case the Court has held there is a crime because of "joining"

a "mob", the full group of which is "disrupting." Nothing could be clearer on that point that the approach of the Court to the "in fact" clause under 18 U.S.C. §1752(a)(2). Again, the Defense believes the entire conviction on this point is based on numerous errors. Nonetheless, the Court itself is claiming a joint offense, even if in error, at least for Counts 2-4.  Indeed, the government and court have shown no differentiation by time or location at the capitol when convicting defendant, in error. If it is to be consistent, the Court should then apply a downward adjustment under U.S.S.G. §3B1.2—Mitigating Role.  The Court found the "mob" participated in a collective offense.  In that case, the multiple-participant requirement of the mitigating role guideline is satisfied.  §3B1.2 cmt. n. 2. As discussed above, the evidence is clear that the Cynthia Prices role was minimal. Accordingly, the Court should reduce her offense level by four levels.  §3B1.2(a).  But even if the. Prices' s role was not "minimal," it certainly fell between "minimal" and "minor," in which case the Court should decrease her offense level by three levels.  §3B1.2(b).

"The propriety of a downward adjustment is determined by comparing the acts of each participant in relation to the relevant conduct for which the participant is held accountable and by measuring each participant's individual acts and relative culpability against the elements of the offense." *United States v. Morales*, 445 F.3d 1081, 1085 (8th Cir. 2006). *See also United States v. Rodriguez-Cruz*, 225 F.3d 1054, 1060 (9th Cir. 2001) ("The defendant is to be compared to all participants in the illegal activity, not just to his co-defendants.").

### D.  <u>*The Court Should Apply a 2-Point Downward Adjustment Under Future U.S.S.G. § 4C1.1. That Becomes Effective November 1, 2023*</u>

The United States Sentencing Commission has proposed amendments to the sentencing guidelines that go into effect on November 1, 2023.   These amendments were proposed after the

considered judgment and evaluation of the required factors by the Sentencing Commission. The amendments will take effect absent action by Congress. Counsel is not aware of any contemplated action by the legislature to override these actions by the Sentencing Commission. That is if the Prices were to be sentenced on or after November 1, 2023, the guideline range will be lower, AND the Court would be urged to not order a sentence of imprisonment.

If the Court is unwilling to calculate the guidelines based on these forthcoming amendments the Court should factor the changes in crafting a sentence and vary from the guideline range. If the Court is further unwilling to consider a variance to conform with the changes the Prices Price would move the Court to continue the sentencing in this matter until some convenient time after November 1, 2023. The proposed amendments will create a new guideline section §4C1.1. This new section creates an adjustment to the offense level in certain conditions. Here is the relevant portion of this new section:

§4C1.1. Adjustment for Certain Zero-Point Offenders

(a) ADJUSTMENT.—If the defendant meets all of the following criteria:

(1) the defendant did not receive any criminal history points from Chapter Four, Part A;

(2) the defendant did not receive an adjustment under §3A1.4 (Terrorism);

(3) the defendant did not use violence or credible threats of violence in connection with the offense;

(4) the offense did not result in death or serious bodily injury;

(5) the instant offense of conviction is not a sex offense;

(6) the defendant did not personally cause substantial financial hardship;

(7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;

(8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights);

(9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and Criminal History 88 | April 27, 2023

(10)    the defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged in a continuing criminal enterprise, as defined in 21 U.S.C. § 848;

The Defense argues both Cynthia Price and Christopher Price check all of the boxes in this new section and both would qualify for the adjustment.

The new guidelines will have a further addition that should guide the Court's sentencing analysis.  There is a new application note for §5C1.1, note 10.  This note states that for persons who receive an adjustment under §4C1.1 and their guideline range is in zone A or B of the sentencing table a sentence other than a sentence of imprisonment, in accordance with subsection (b) or (c)(3) of §5C1.1, is generally appropriate.  With these amendments to the guidelines and all of the other points herein the Court should impose a range in Zone A and not provide a sentence of imprisonment.

### E.  _The Court Should Provide Consider the Policy Under 1B1.13 to Eliminate, Delay or Reduce Any Potential Term of Imprisonment For Extraordinary and Compelling Reasons_

Under Application note for 1B1.13, extraordinary and compelling reasons exist under any of the circumstances set forth including:

(A) Medical Condition of the Defendant—

(i)     The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory.  A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required.  Examples, include metastatic solid-tumor cancer….

(ii)    The defendant is:

(I)     Suffering from a serious physical or medical condition

The Defense argues that the Court should consider this provision for Christopher Price in sentencing as relates to his recent recurrence of prostate cancer which at least a very serious medical condition.

**VII.    The Sentencing Criteria Support A Relatively Minimal Sentence**

   **A.   _The Nature of the Offense Conduct, Respect for the Law, a Just a Punishment, Adequate Deterrence and Public Protection All Support a Relatively Minimal Sentence_**

The objective is for just and fair sentence pursuant to 18 USC 3553 (a) that is not greater than necessary to reflect the seriousness of the offense; to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence; to protect the public from further crimes of the defendant. Accomplishing this starts with eliminating excessive constructs and arguments. This first starts with the specific and limited nature of the offense conduct.  That conduct is not the event—January 6th.  The Prices understand that January 6th was a substantial negative event for the Country.  They have no desire to knowingly, physically disrupt any proceeding.

The Prices entered the Senate Wing door for a minute without any of the police officers informing them at entrance.  After police informed them, they got in line to exit.  All of this is discussed extensively above. They never disobeyed an instruction that day and respect law enforcement.  Prices both have zero points regarding prior criminal conduct. The Prices have

been under court supervision including substantial periods with a probation officer from August 2021 until sentencing.  That is over two years and no violations of the terms.

There should be no punishment for the Prices exercising their Sixth Amendment right to trial.  A trial penalty is inappropriate and illegal.

Christopher has been working hard for his small business.  Support letters address the range of things he does and is critical toward in his business, community, as a father, addressing is AA work, addressing his cancer.  Cynthia has been working hard, helping her youngest adult child that lives with her. She helps in her husband's small business. Cynthia helps and will further need to help her husband with further cancer treatment and care, including possible side effects.  Again, the letters of support attest to all of this.

The. Prices certainly do not want a repeat of the burdens, cost, and stress caused by this prosecution. The instant case is a very quirky situation. People are not asked to home when they see a police light on a police car.  People are not advised, not to step over 1-foot separations between grass and walkways.  People walk into public buildings daily and expect security measures to be told and addressed inside the door. To the Defense's knowledge before January 6th, we are unaware of a single situation where a party has been arrested, let alone convicted for walking into a public building, unless it also included not following the instruction of a police officer to leave.

What the Defense has recommended is more than sufficient, and more is well beyond unnecessary.

### B.  _History and Characteristics of Christopher Price Support a Minimal Sentence_

Christopher Price is a man who turned his life around over 22 years ago and about 23 years ago.  With this one exception regarding conduct on January 6, 2021, and a speeding ticket, he has not been in trouble with the law since that time.  Chris had a drug and alcohol problem, described in the PSR, but has not taken drugs or alcohol in over 22 years.  Christopher Price stepped up and has since lived his life at the highest levels of family, community, and morality. He has been a faithful and supportive, first boyfriend, and then spouse. He has been a father in a family he married into and stepped up for each of three boys who are now fine, young men. One of those young men is in the army. One is in college.  One still lives with the Prices. Chris works with the younger son sometimes and helps care for him.  Chris has stepped up to be a mentor and volunteer to help specific people avoid the pitfalls of drugs and alcoholism as he has for the past number of years.  He is religious and finds strength of morality and the strength to endure burden from his family and God.  He is the lynchpin of a small printing business where he works all the time, keeping the small business operating, and delivering reliability and quality for customers. January 6, 2021 was one of his very few days off and he went to see a Trump rally with his wife as he had done once before in Pennsylvania.

He has been a lynchpin in the small community of Emmitsburg where he has strong relationships and is a role model.  Christopher began working for a printing shop, Chronical Press, in Emmitsburg, Maryland in 1996.  He became a part owner in 2004.  In 2022, Christopher earned an annual salary of approximately $33, 400 before taxes.  He works approximately 55 hours a week. Christopher gets few breaks given his presence is necessary to run the small business shop.

Between the small business and taking care of the family, including Cynthia's son still living with the Prices, any absence has detrimental effects to business and family.  Any longer-

term absence greater than a few weeks would likely crater the small business and have fundamental detrimental effects on the family.

Chris has had two types of cancer. He had treatment for a melanoma about five years ago. More recently he has been diagnosed with prostate, had the prostate removed, is still subject to monitoring for prostate cancer. His physician indicates that stress matters to being cancer free, and a treatment for return of prostate cancer may not be as successful as prior treatments. Cancer treatments tend to reduce or eliminate a subset of cancer cells, but the ones that remain are resistant to the prior treatment. A return of the cancer could be fatal. Christopher just finished cancer radiation (low dose radiation in his abdomen) in 2022 given the "uptick in his numbers." The defendant is hopeful his numbers will go down, but he is being monitored and will undergo a blood test in August of 2023. The defendant receives treatment at the James Stockman Cancer Institute through Frederick Health, in Frederick, Maryland. Defendant was diagnosed with prostate cancer in 2019 and had his prostate removed in 2019. The defendant continues to suffer from urinary and bowel movement negative side effects. Chris has been taking a regimen of diet and stress management steps and takes it very seriously. He also had a strong sense humor, which can be important to help avoid stress. Chris is on the Budwig diet, which, among other things, involves, eating a smoothie with cottage cheese, flax seed, and flax seed. Chris eats the same thing every morning and has done so for several years. Chris is supposed to avoid, were reasonable, polyunsaturated fats and sugar. Right before trial the problematic numbers for Chris started to go back up.

Christopher John Price was born on October 13, 1965 in Washington, DC to John Price and Margaret Price (nee: McConnell). The defendant's father passed away approximately 15 years ago in his sleep, possibly due to heart issues. The elder Mr. Price had a work history as a

fireman in Washington, DC as well as worked for the National Fireman Academy prior to retiring. The defendant's mother passed away in 1994 due to liver failure. Christopher has three brothers and a sister. John Price Jr. (age 63), David Price (age 61), and Steve Price (age59) reside together in Emmitsburg, Maryland. John has a work history at the National Fireman Academy, David works in landscaping, and Steve operates a dump truck for item removal. Catherine Price (age 37) passed away of ovarian cancer approximately 15 years ago and has an employment history as a restaurant worker. Christopher is close his nieces, Crystal and Amber (both in 20's) and all his family members.

Christopher Price grew up in Prince George's County, Maryland. His father was a fireman and his mother stayed at home to care for the children. Both parents were always in the home, and he grew up around other families of firemen and often went to events held by the fire department. Christopher recalls his mother and father drinking as he was growing up given it was part of the fire fighter culture.

Christopher had a history of alcohol, marijuana, cocaine, heroin and LSD use. He first consumed alcohol at age 12 and drank occasionally with peers. As an adult he was a "weekend partier" and would drink beer heavily at bars and sometimes would not know where the night would lead. The defendant's drinking became excessive from age 25 to 35. Christopher received four DUIs as a result. Chris also began using marijuana at age 12, and this was his drug of choice, smoking it daily for a time. The defendant also experimented with cocaine, heroin and LSD.

Chris is extremely proud of his sobriety and has been clean for over 22 years, since November of 2000. Regarding drug treatment, Chris has been in inpatient (when incarcerated) as well as outpatient drug treatment programs as a result of his past drug related convictions. He

became involved in the Alcoholics Anonymous (AA) organization in 1999, which has become a central part of his life. He "loves AA," has a mentor, serves as a mentor to others, chairs their Friday meetings, and engages in prosocial activities as part of the organization and his church. Chris has had a spiritual awakening as part of his AA recover. Cynthia, defendant's wife, is extremely supportive of his involvement in AA.  Both Chris and Cynthia are very religious and their faith is important to their decisions.

The PSR makes a fundamental mistake by comparing an annual income number (which the PSR labels as monthly) to monthly expenditures to arrive at an enormous and false monthly net income statement in the PSR.  Christopher Price had provided monthly income numbers that should not have been multiplied by 12 for purposes of paragraph 79.  Any recommendations flowing from such analysis have no proper basis. Accordingly, since the PSR analysis is fundamentally flawed, the Court should ignore the recommendation of the PSR regarding payment of fines.  Or at least the Court should understand that such fines would be very substantially punitive under the financial situation of the Prices.

As an observation, the Christopher Price receive substantial financial assistance to assist with his prostate procedure from Frederick Health because his income was relatively low and qualified for financial assistance. The Prices have medical coverage through insurance offered under the Maryland Health Connection program and almost all of it is covered by Advance Premium Tax Credits. Again, this is because the Prices have a household that qualifies.

### C.  *The Very Recent Diagnosis and Recommended Treatment for The Recurrence and Migration of Prostate Cancer Supports A Minimal and Properly Tailored Sentence*

Christopher Price previously had prostate cancer and his prostate removed.  Christopher had a prostate-specific antigen (PSA) test in August, which showed elevated levels.  Dr.

Berkowitz (Chris's urologist) referred Chris to Dr. Gagnon, a radiologist. Chris and Cynthia met with Dr. Gagnon who recommended a PET scan. Chris and Cynthia met with Dr. Gagnon on September 19, 2023, where Dr. Gagnon went over the results and recommended a course of treatment. Dr. Gagnon identified that the prostate cancer likely had migrated to at least two lymph nodes. Dr. Gagnon recommended a 6-week course of radiation therapy, and possibly, hormone therapy.  Chris has scheduled to start the radiation therapy October 4, 2023.  Defense Counsel informed the government about these short points on September 19, 2023.  A subsequent letter from Dr. Gagnon is attached. The letter describes a daily treatment regimen.  Radiation therapy comes with potentially significant side effects during and after treatment.

### D.  *The Need for Unwarranted Disparities Support the Need for a Minimal Sentences for Christopher and Cynthia Price*

1. **Sentences Outside of January 6th Even to Disruptive Behavior at the Capitol or Demonstrations Have Been Minimal**

*United States v. Barry*, Criminal No. 19-mj-49 (RMM) (D.D.C. Jan. 22, 2020) indicates that Tighe Barry was sentenced to Six (6) days incarceration with credit for time served, a $25.00 Special Assessment, and $75.00 fine.   *Barry* involved 5104(e)(2)(D) and 5104(e)(2)(G) and was applied to the demonstration activities of a defendant protesting Justice Brett Kavanaugh's nomination to the Supreme Court, *see United States v. Barry,* No. 18-00111 (RMM) 2019 WL 2396266 at *1 (D.D.C. June 5, 2019). In *United States v. Nassif*, CRIMINAL ACTION 21-421 (JDB) (D.D.C. Sep. 12, 2022) the Nassif Court used the example as to how 5104(e)(2)(G) was not selectively applied to Trump supporters. The officers observed Mr. Barry allegedly placing a pink tiara hat on his head with the writing "KAVA-NOPE CODE PINK" and allegedly advised him that demonstrating was prohibited and to remove the hat. *Id*. Mr. Barry then pulled out a

large sign and stood on top of his chair and allegedly began shouting in the direction of the hearing committee members. *Id*. at 1-2.

When approached by the officers, Mr. Barry allegedly leapt from his row of chairs to the row in front of him, causing a chair to dislodge towards other attendees behind him and allegedly injuring another hearing attendee. *Id*. at 2. The officers then removed Mr. Barry from the hearing room, while he allegedly continued to shout, carrying him out by his arms and legs. *Id*. Mr. Barry was then arrested and charged in D.C. Superior Court with three D.C. Code offenses: Unlawful Conduct Capitol Grounds, Resisting Arrest, and Disorderly Conduct. *See* Def.'s Mot. at 1 & Ex. 1 (D.C. Superior Court Docket No. 2018 CMD 013221).

https://www.nbcnews.com/politics/supreme-court/protests-build-capitol-hill-ahead-brett-kavanaugh-vote-n917351

*United States v. Charter*, 1:20-cr-135. On June 19-20, 2020, during a civil disorder in Washington, DC, Charter was dressed in signature Antifa attire - all black with a dark covering over his face - and participated in the destruction of an historical statue belonging to the United States Park Services.[2] *See id.,* ECF 1-1. Charter was caught on video pouring fuel on the statue and lighting it on fire.

This was all committed within a restricted area in Washington, DC, adjacent to the White House complex, where the president resides. *Id.* ECF 38. To access the statue that he set ablaze, Charter had to dismantle multiple fences. Charter was carrying a large stick. "Dozens of law enforcement officers from the United States Park Police and the Metropolitan Police Department [were required] to respond to Lafayette Park to secure the park and the safety of the persons and

---

[2] https://www.youtube.com/watch?v=rLCFfGcFQ5w last viewed September 22, 2023

property therein." *Id.* This all occurred in the midst of a larger civil disorder that the dozens of officers were responding to. For these offenses, Charter was sentenced to probation without incarceration.

### 2. Defendant's Conduct was Minimal and Limited for J6

When comparing J6 cases several things are important to note.  As discussed above, the conduct of the Prices was in the most minimal category. Second, the evidence is the Prices followed police instruction to enter the line to exit. As a matter of conduct, there is no lower level J6 case.  At worst, the Prices are on the same tier as the lowest levels of J6 cases.

As a few short examples, Eric Cantrell (1:22-CR-00121-TNM) was convicted of 18 U.S.C. § 1752(a)(1), (a)(2); 40 U.S.C. § 5104(e)(2)(D), (e)(2)(G) in a plea agreement. Prosecution proposed 30 days' home detention, 36 months' probation, 60 hours' community service, and $500 restitution.  The Court sees fairness in a more lenient sentence of no detention, 3 months' probation, 40 hours' community service, and $500 restitution. There should be no trial penalty.

The following cases are a sampling where a misdemeanor was charged and pled to and resulted in no incarceration:

\*\**United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (Jun. 28, 2021) (sentenced to probation);

\*\**United States v. Danielle Doyle*, 21-cr-00324 (TNM)(Oct. 1, 2021) (sentenced to probation even though she entered through a broken window and yelled at police officers);

**United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (sentenced to probation);

**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF Nos. 42 & 44 (sentenced to supervised release with home confinement even though Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied media accounts of violence were accurate, minimized the conduct of all of the rioters, 3) called for a revolution even after the events of January 6, 4) encouraged the rioters to be proud of their actions, and 5) minimized the impact of that day on lawmakers and democracy. *See United States v. Jessica and Joshua Bustle*, 21- 00238 (TFH). Judge Hogan imposed a probationary sentence with a short period of home confinement for Ms. Bustle and an even shorter period of home confinement for Mr. Bustle.

There are many examples with more significant conduct than the Prices that got no prison time. The Prices are in the lowest tier of conduct.  The latest J6 sentencing table can be found here. https://www.justice.gov/file/1594006/download. (last reviewed September 22, 2023). The case descriptions can be found here. https://www.justice.gov/usao-dc/capitol-breach-cases. (last reviewed September 22, 2023.

Consider, in *United States v. Derek Jancart and Erik Rau*, 21-cr-00467, this Court sentenced both defendants to 45 days of incarceration. The government cited that the men came to D.C. with gloves, a gas mask, and two-way radios. *Id.* Additionally, Mr. Jancart posted a video on Facebook during January 6, where he is heard laughing at police while Mr. Rau screamed, "We have you surrounded!" Additionally, Mr. Rau, was on probation at the time of his offense on January 6 for domestic violence.

Dated:  September 22, 2023                    Respectfully submitted,

                                             /s/ Nandan Kenkeremath

                                             Nandan Kenkeremath
                                             DC Bar 384732
                                             2707 Fairview Court
                                               Alexandria, Virginia 22311
                                               703-407-9407