# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**CYNTHIA BALLENGER, and**<br>**CHRISTOPHER PRICE,**<br><br>　　　　　　**Defendants.** | **Case No. 1:21-cr-00719 (JEB)** |

## DEFENDANT CYNTHIA BALLENGER'S (PRICE'S) MEMORANDUM IN AID OF SENTENCING

### I.　　Summary

Comes now by and through undersigned counsel file Defendants' Cynthia Ballenger (Price) respectfully submits this sentencing memorandum. The trial included both Cynthia Price and Christopher defendants. The defendants were convicted of 4 misdemeanor Counts[1] but as discussed below the same, limited offense conduct effectively forms the basis for all counts. The offense conduct, for each the of charges in this case, is the act of "entering" the foyer by the Senate Wing door of the U.S. Capitol, and, in addition, for Count 2, the Court noted "being" on the West Terrace.  The Prices went south inside the Senate Wing door and then, like everyone else at the time, as shown in the government closed circuit video (CCV), turned to get in line to exit.  The time going south was about a minute and within 2 minutes they were in line to exit headed to go

---

[1] Count 1 is a violation of 18 U.S.C.§1752(a)(1). Count 2 is a violation of 18 U.S.C.§1752(a)(2). Count 3 is a violation of 40 U.S.C. §5104(e)(2)(D). Count 4 is a violation of 40 U.S.C. §5104(e)(2)(G).

out.  The walk south was peaceful and the time in line was civil and peaceful.  Neither defendant waived a flag nor shouted nor chanted nor displayed any politically expressive conduct to anyone there.  There is no evidence that the defendants did anything while on the Northwest Terrace or West Terrace.  They observed, peacefully walked, stood and took pictures or video.   At no time is there evidence that defendants ever disobey an instruction from a police officer.

The Defense argues that, based on the actual offense conduct and all other factors, the sentence should be in the lowest, possible tier.  As stated by the court:

> What's sort of interesting about this whole trial is that I agree with you, Mr. Kenkeremath, that on the spectrum of conduct that I have seen, and I have seen a lot, that your clients definitely fall on the lower end.  And that's sort of relevant, certainly for a sentencing analysis…. Trial Tr., March 21, 2023 at 165.

Earlier in the trial the Court had stated:

> Okay. I think you make some interesting points.  And I think certainly the defendants' conduct here in the Capitol is considerably less offensive than most people given their time in there. Trial Tr., March 21, 2023 at 30.

As discussed below, the specific video that catches every second of the Defendant's conduct in the foyer of the Senate Wing Door and the trial transcript is even more clear that the only conduct is peacefully walking for about a minute and then waiting in line to exit for 5 and ½ minutes after police say to go no further.

## II.   Relationship of Memoranda

Due to common elements, the Memoranda in Aid of Sentencing for Cynthia Ballenger (Price) will largely incorporate by reference blocks of the discussion in the Memorandum in Aid of Sentencing [ECF 131] and related Appendices of Christopher Price.   The blocks effectively

shared by Christopher and Cynthia include: I. Summary & Outline; II. Legal Standard; III. Offense Conduct and Statement of Objection to PSR Statement of Offense Conduct; IV, The Office Conduct Is Properly in Zone A; and the Need for Unwarranted Disparities. Christopher has a small additional discussion in the sentencing guidelines section concerning application of U.S.S.G 1B1.13 as potentially related to the very recent and very bad news of the recurrence of his prostate cancer and treatment.  A substantial amount of the memorandum in aid of Sentencing for Cynthia Price is devoted to challenging both the inappropriate proposed adjustment under U.S.S.G 3.C.1. Christopher and Cynthia have separate sections on

By minute order of July 24, 2023, the Court ORDERS that Defendants' 128 Motion is GRANTED inasmuch as they may include whatever objections they like in their Sentencing Memoranda. So ORDERED, by Chief Judge James E. Boasberg on 7/24/2023. (nbn).  As an attachment to this memorandum in Aid of Sentencing both Christopher Price and Cynthia Price set out additional objections beyond those found in the body of this memorandum.

### III.    Recommendation

The Defense recommends a sentence of 1-year probation and $500 restitution for each Defendant.  Should the Court find this insufficient, the Defense recommends either adding a modest additional fine of $500 to $1000, or a short term of home detention between 10 to 30 days. If the Court should find this insufficient the recommends the Court add community service between 30 to 60 hours.

### IV.    Legal Standard

The appropriate legal standard is discussed in the Memorandum in Aid of Sentencing for Christopher Price.

### V.    The Actual Offense Conduct Identified by The Court and Based on Evidence Is Very Limited and Minimal

The argument that the actual offense conduct is very limited and minimal based on evidence is discussed in the Memorandum in Aid of Sentencing for Christopher Price which is referenced here. In addition, to argument in the main body of the Memorandum in Aid of Sentencing for Christopher Price, this section is part of the objection to issues in the PSRs which are also set out as an attachment to the Memorandum in Aid of Sentencing for Christopher Price.

### VI.    The Prices Conduct Under the Sentencing Guidelines Is Properly in Zone A

The primary argument concerning the sentencing guidelines are discussed in the Memorandum in Aid of Sentencing for Christopher Price and is referenced here. In addition, to argument in the main body of the instant memoranda, this section is part of the objection to issues in the PSRs. These arguments cross-reference include:

A. *The Base Offense Level Should Be 6 Points and Based on USSG §2B2.3 And Not USSG §2A2.4*

B. *The Rule of Lenity Applies Given Any Ambiguities Including Regarding the Selection of the Proper Base Level and Adjustments; Defendants Object That the USPO Failed to Consider the Rule of Lenity*

C. *If The Court Does Not Follow Judge Friedman In Selecting U.S.S.G. § 2B2.3 for a Base Level of 6, The Court Should Apply a 4-Point Reduction Under U.S.S.G. §3B1.2 Because the Court Statements About 18 U.S.C. §1752(a)(2) Reflects A Joint Offense of Multiple Parties and A Preponderance of the Evidence Shows Defendant's Conduct Was Minimal Related to the Joint Offense*

D. *The Court Should Apply a 2-Point Downward Adjustment Under Future U.S.S.G. § 4C1.1. That Becomes Effective November 1, 2023*

### VII.    The Court Should Reject the USPO's Proposed Upward Adjustment for Obstruction

A. *The Adjustment for Obstruction of Justice Enhancement for Cynthia Price in Paragraph 26 the PSR is Based on a Clearly Incorrect Reading of Statements of Officer Belcher and Has No Basis Under USSG 3C1.1*

4

A plain reading of the Affidavit of Special Agent in the Criminal Complaint [ECF 1-1] shows that the claims in the paragraph 26 of the PSR is incorrect. Paragraph 26 of the PSR claims that Cynthia Price denied being at the U.S. Capitol on January 6, 2021. That claim is false on the face of the Affidavit. Paragraph 26 of the Affidavit states:

> ….BALLENGER denied having been at the U.S. <u>Capitol "at the time" when others damaged property and assaulted law enforcement officers.</u> BALLENGER said that there were different categories of people <u>at the U.S. Capitol and she believed that she and PRICE were on the low-end of the spectrum</u>…. (emphasis added)

The sentence saying that "she and PRICE were on the low-end of the spectrum" of "different categories of people at the U.S. Capitol" specifically says "she" and Chris were a subset of the different categories of people "at the U.S. Capitol". There is no other reading of the statement in the Affidavit. Special Agent Belcher simply did not state otherwise in any venue including the trial. The "at the time" qualifier is also a double confirmation that she said she was at the Capitol, just not in a situation where she directly saw people damaging property or assaulting police at her time and location at the Capitol. The Defense made this and other arguments in response to the draft presentence report and the government still fails to include the actual language of the affidavit or address the Defense argument.

It is also true that there is no evidence that while Cynthia or Chris was in the foyer that anyone damaged property or assaulted police officers in their presence. The evidence is the opposite and the USPO should not try to claim otherwise. Nor is there evidence on the West Terrace, at the time and location the Prices were there, that anyone damaged property or assaulted police officers in their presence.

As stated in application note 1: "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense

of conviction." 4(G) applies for providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense.  Note 5 B says making false statements, not under oath does not apply unless Note 4(g) applies.

The USPO has failed to provide any basis for the statement that Cynthia made a materially false statement.  Nor has the USPO shown how any statement significantly obstructed or impeded the official investigation or prosecution of the instant offense. Special Agent Belcher would need to testify to that or show that. There is no indication of any such impact on investigation from any statement of Special Officer Belcher at trial. There never was any question Cynthia Price was at the Capitol on January 6, 2021. Cynthia's Facebook posts indicate this and pictures on her phone indicate this.  All of these were obtained by Special Agent Belcher.  So how did anything significantly obstruct or impede?

The Defense believes, on its face, the Belcher Affidavit refutes the USPO claims, about the Belcher Affidavit.  If the Court still considers proceeding against Defendant on the issue of what the Belcher Affidavit means, the Defense requests an evidentiary hearing before final sentencing that includes Mr. Belcher.

The U.S. Sentencing Commission, Guidelines Manual, Annotated 2021 Chapter 6 - Sentencing Procedures, Plea Agreements, And Crime Victims' Rights explains:[2]

Commentary

Although lengthy sentencing hearings seldom should be necessary, *disputes about sentencing factors must be resolved with care*.  When a dispute exists about any factor important to the sentencing determination,

---

[2]    https://www.ussc.gov/guidelines/2021-guidelines-manual/annotated-2021-chapter-6

***the court must ensure that the parties have an adequate opportunity to present relevant information.***  Written statements of counsel or affidavits of witnesses may be adequate under many circumstances.  <u>See, e.g.</u>, <u>United States v. Ibanez</u>, 924 F.2d 427 (2d Cir. 1991).  ***An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues***.  <u>See, e.g.</u>, <u>United States v. Jimenez Martinez</u>, 83 F.3d 488, 494-95 (1st Cir. 1996) (finding error in district court's denial of defendant's motion for evidentiary hearing given questionable reliability of affidavit on which the district court relied at sentencing); <u>United States v. Roberts</u>, 14 F.3d 502, 521(10th Cir. 1993) (remanding because district court did not hold evidentiary hearing to address defendants' objections to drug quantity determination or make requisite findings of fact regarding drug quantity); <u>see also</u>, <u>United States v. Fatico</u>, 603 F.2d 1053, 1057 n.9 (2d Cir. 1979), <u>cert. denied</u>, 444 U.S. 1073 (1980).  The sentencing court must determine the appropriate procedure in light of the nature of the dispute, its relevance to the sentencing determination, and applicable case law.

The USPO also claims declining to provide information qualifies under USSG 3C1.1. Declining to provide information does not satisfy the requirements for an obstruction enhancement under USSG 3C1.1.  Not providing information is not listed under USSG 3C1.1 (4) or like anything on that list. The USPO makes the point that note 4 is a non-exclusive list.  However, there are several points.  First, and foremost, the Fifth Amendment says everyone has the right to not answer questions asked by a government agent. This is a famous right for which the USPO must be aware.

Not that it is necessary to preserve exercise of such Fifth Amendment right from punishment, but Application note 2 clearly states "[t]his provision is not intended to punish a defendant for the exercise of a Constitutional right.

The USPO has provided no basis to include any alleged failure to provide more than limited information.  The USPO has provided no legal support for this.  While not listed in the Affidavit, Cynthia Price stated several times she wanted to have a lawyer. The USPO's position in trying to enhance punishment in such a situation is a violation of Fifth Amendment Rights and rights to an attorney.

### B.   *The Adjustment for Obstruction of Justice Enhancement for Cynthia Price in Paragraph 26 the PSR is Based on Court Testimony Cited by the Government and USPO After Providing the Defendant the Draft PSR Has No Basis Under USSG 3C1.1*

First, the defense argues that the role of the USPO is not to rubber stamp whatever the government sends them, particularly where the USPO make no attempt to understand what the government states, does not appear to check any evidence—even when specifically provided and argued by the defense, and, in this case, fails to afford Defendants an opportunity to respond on a major matter prior to publishing the final PSR.   In paragraph 26 of the Final PSR, the USPO not only failed in any manner to address Defendants arguments regarding the draft presentence report on the Adjustment for Obstruction of justice based related to the Belcher Affidavit and interview, but also added a fundamental new attack explicitly sent by the Government on June 13, 2023.  The Defense objects that such a process is neither fair nor transparent.   Moreover, the Defense's statement of objections – interpreted by USPO-- which is an appendix in the final PSR is now fundamentally incomplete and inaccurate as the report contains new accusations. There was not even a pretense that the USPO consider Defense comments or questions on the matter.  Yet the USPO accepts the claims as gospel.

Moreover, the Defense objects to the preferential access and rubber stamp deference given to the government's transmission of June 13, 2023.  This entire line of attack should be dismissed based on these procedural failures alone.  On this particular matter, the USPO either conducted a sham process or no process.

While the United States Supreme Court has recognized that a trial court is within its discretion to enhance a defendant's sentence under USSG § 3C1.1 when a defendant testifies and is nevertheless convicted, the Court was careful to note that such an enhancement is only appropriate when there is false testimony given with a "willful intent to provide false testimony." *United States v. Dunnigan*, 507 U.S. 87, 94–95, 113 S. Ct. 1111, 122 L. Ed. 2d 445 (1993). Addressing the requirements of section 3C1.1, the Supreme Court stated: "[I]f a defendant objects to a sentence enhancement resulting from her trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same, under the perjury definition we have set out." 113 S. Ct at 1117. To secure that right, the Court held, if an accused challenges a § 3C1.1 sentencing enhancement based on the accused's testimony at trial, the district court must make factual findings that satisfy all three elements of perjury — falsity, materiality, and willfullness — contained in 18 U.S.C. Section 1621. *Id.* at 96-97, 113 S.Ct. 1111.

The Defense provides an analysis here and notes that the Court has yet to make a finding of perjury in this matter with each element, and rather has, inappropriately and vaguely claimed some issues affected the Courts view of credibility and without proper evidentiary support.

 

1. **Cynthia Price did Not Decline to Make a statement That She Did Not See Police Officers Inside When Entering**

The final presentence report at P 26 states:

The Government provided additional information to the U.S. Probation Office on June 13, 2023 from the defendant's testimony at trial and highlighted that defendant Ballenger testified that she didn't see officers and broken glass when she walked in the Capitol, as well as refused to agree that, on Facebook, she said she wanted to be heard, and that was her motive for entering the Capitol.

First, Mrs. Price (Ballenger) did not state she didn't see police officers when she walked into the Capitol.  The government and defense both presented the video of the Prices entrance which covered the entire time of the Prices in the Capitol.  It is obvious there are police right there inside the door. Virtually every defense memorandum and the defenses opening statement talks about the many police inside the door. Many questions of witnesses during trial covered this. The Defense points during the trial, and in many memoranda, was two-fold.  First, the line of police inside the door was a police cordon within the meaning of the relevant statutory terms of 1752 (c) and the Prices did not cross such cordon.  Second, no police at the door told the Prices not to enter.  Both points were uncontroverted during the trial and a key feature of the trial.  The defense pulled up exhibit 303 while Cynthia Price was on the stand and the first picture in the exhibit clearly shows the line of police officers inside the door—a point that had been discussed ad nauseum in the trial and included in the Defense videos including  Defense Exhibits videos 200, 303, and 400. The transcript fully confirms and refutes the USPO claims

Q: And when you walked in, you saw a line of police officers in riot gear, didn't you?

A: They were standing inside the door, yes.

Trial Tr. 3/21/2023 at 105.

10

There should be no adjustments based on late information that the USPO does not even understand and neither the government, nor the Court in the transcript, accurately communicates.

> ### 2. Cynthia Price Properly Spoke About the Police Cordon Outside and Away from the Senate Wing Door and The Issue Is Not Material Other Than as An Example of Yet Another Police Cordon That the Prices Did Not Cross

The USPO does not refer to police not at the Senate Wing Door. The Defense should not have to cover the issue. An obstruction claim should be stated clearly and about a clear matter with evidence clearly controverting testimony. Out of caution, the defense addresses the identification of the police line not near the Senate Wing Door. The Defense notes the cross-examination questions and response related to this issue were rapid fire and the two parties where often not clearly communicating the issues. Note Trial Tr. 3/21/2023 at 120:

Q: And you saw police in bright yellow jackets, right.

A: I did see at least one. That was on our way out, yea.

Q: What about that whole line that you took a picture of?

A: I think the ones in the building were all dressed in black.

Q: Well, you saw them on the way out is what I am asking.

A: Yes, we saw them as we were leaving.

Defense Exhibit 300, Picture 14, presented during the testimony of Mrs. Price shows a picture taken by Christopher Price. It is the same as government exhibit XX and in the same sequence as presented in in 107. There is no evidence showing the Prices near the external line of police

officers until the picture which, in sequence, was taken after being in the Senate Wing Door foyer.  That picture and that sequence was discussed in direct examination.  No witness statement nor the government claims that Christopher Price took the picture before entering the Senate Wing Door. Indeed, what any other evidence shows in connection with the Prices is that the Plaza was crowded, and it was difficult to see inside the crowd.  During direct examination this line of police officers was discussed in detail including the particular location where these officers were – which is not near the Senate Wing door. The Defense direct spent specific time on this and had Mrs. Price identified the location on the screen Page 62.

This line of police officers did not form a cordon at all restricting entrance to the Senate Wing door and did not form a cordon restricting the area of the West Plaza were the Prices stood.  Quite clearly, this cordon was cordoning off what was behind this line and not in front of it.  Evidence shows the plaza was crowded.  For example, about 1 minutes of Government Exhibit 202 E was shown by the government to identify that the Prices were somewhere in that crowd.  We are still not sure we can easily identify them. Defense Exhibit 300 Picture 9 is also on the Upper West Terrace with a crowd and Chris and Cynthia there.  One cannot see the right-side police cordon at the time.    The video covers a wide space and the external police line which should be forming on the wall to the right of the screen cannot be seen. That exhibit also shows a peaceful crowd. Government Exhibit 202D shows how fluid the presence of any particular group of police.  For example, inside the Senate Wing Door, at the beginning of the video there are at least six officers in yellow jackets but between 3:21:20 and 3:21:40 all but two of these officer's leave. The remaining composition is properly described by Cynthia.  The line is mostly black uniform except the one guy in yellow which Cynthia properly noted.

The issue of whether Mrs. Price saw the external line of police officers nowhere near the door before she entered is not material.  The Prices did not cross that external line of police officers.  Mrs. Price did not cross any line of police officers.  There was no line of police officers blocking her path on January 6th. The external line of police officers neither provide restrictions at the Senate Wing Door nor restrictions on the area of the west plaza in front of that line.

3.  **Cynthia's Claim She Observed the Glass A Little Later Than at the Point of Entry Is Consistent with the Video Evidence That She Is Looking Straight Ahead While Walking And Not Properly Refuted By Evidence**

Mrs. Price said she saw glass on the floor in the Capitol, just not at the specific time of entry. No witness claims Mrs. Price saw glass when she entered as opposed to later.  The video explicitly shows Cynthia looking up and straight for the entire point of entry and first minute. The video also shows the whole scene is quite crowded. There is no particular reason to look down in the first minute.  The USPOs claim is simply ambiguous on what it is claiming, again making it impossible to provide a defense when the USPO cannot articulate the challenge to a Particular Price statement. As stated by Cynthia.


A: So on our way in, when we got in, I don't know if I even noticed the broken window at that time.  I was kind of looking in front of me to see where we were headed. I was kind of looking in front of me to see where we were headed.  And I think it was when we had turned around that it was pointed out to me that there had been a window had been broken, and there was glass on the floor.  So, I just felt compelled to say something, that I didn't agree with that. Trial Tr. 3/21/2023 at 61

Q: From your prior testimony and going through, there's essentially in the first 44 seconds to get to the first police officer, you are saying you didn't have an understanding, but after some time, you came to understand there was broken glass broken window, is that correct? Id.

A: Correct….Id.

Also note how some of the statements are reasonably qualified as they should be—"I don't know if I even noticed the broken window at that time" and "I was kind of looking in front of me. Mrs. Price did this with direct examination pictures and video as she accurately described what was on the screen.

The USPO, and government are trying to drive exactitude about a specific time which is only a few seconds. It was the Defense that walked through the time frames accurately at trial and with time stamps. The cross-examination bore none of those hallmarks of point to specific times and places.

Cynthia's testimony is not contradicted by any witness or video. In fact, the video fully corroborates important points. First, she looks straight and head and never looks down for at least the first minute and until she turns around to get in line to exit. Second, the video shows it is very crowded where she entered and difficult to look down. It is not easy to see things when you are in a crowd.

Questioning and answering on these specifics are not always clear in the testimony. In Trial Tr. 3/21/2023 at 85 the questions and answer.

> Q: …You didn't remember seeing glass on the floor when you walked in right.
>
> A: I did say there was glass on the floor.

14

This particular question and answer should not be construed as Cynthia reversing her point about not seeing glass till later.  She specifically stated she saw glass on the floor in this statement, which she had previously stated.  She did not say "I saw glass on the floor the second I walked in."   She did not say "correct."  There was no intention to change what she had stated on direct. She did not change that statement. This point is made absolutely clear in the cross-examination at Trial Tr. 3/21/2023 at 120:

> Q: And you testified on direct that although you didn't see any of these things on the way in, that on the way out, you saw glass on the floor right?
>
> A: That is correct.
>
> And you saw a broken window, right?
>
> A: That is correct.

So, again, the issue is not that Cynthia changed testimony on cross examination—she did not. Cynthia's testimony is effectively the same as on direct.   There is no basis in any of this to identify perjury or support an obstruction charge.

**4.    The USPOs and Government's Argument that Cynthia's Statement Regarding a Political Conversation with a Liberal Friend on Facebook Defines Her Conduct Is without Basis; Cynthia Properly States Her Point and Relevant Belief That She Did Not Say or Display Anything Political, And, Accordingly,  Was Not Attempting to Be Heard When She Walked Through an Open Door She Observed Sometime After 3:07 pm.**

The USPO and government present half of a conversation in Government Exhibit and tries to extrapolate a largely political conversation.  Generally, Cynthia has not believed she did anything illegal, but some others did. Casual conversations on Facebook were not designed to

suggest she went to disrupt anything and to communicate a political view point inside the Capitol.  In fact, she said nothing.  However, there are a range of statements:

Ppl were just let in the capital building…Some did force their way in and cause damage and they should and will hopefully be charged!!  Government Exhibit 306 slide 3

…My point here wasn't about the protesters it's about what media and the politicians are doing.  We All have a right to be heard!! We do not have a right to break shit!! Government Exh 306 slide 4.

…Hard to do when u r let in and walk out…Id at slide 5

… I would say it was about 2-3 buses [i]f ppl there that caused the problem and they were mixed in with supporters who are also fed up with everything that is going.  Not enough to smash windows but to go in a building to be heard yes maybe.

"I have condemned violent protests and lawlessness every single time they've been reported. I condemn the actions of those who stormed the Capitol yesterday.  But I refuse to condemn hundreds of thousands of peaceful protestors because a handful (52 arrested) chose to be lawless and to defy everything the vast majority of the crowd stood for. Conservatives are defenders of the Constitution, the police, and the rule of law. Id. At 8.

The Defense, including in Cynthia Price's testimony in response certain cross-examination questions, honestly takes issue with the government's position that the silence of Cynthia Price has substantial legal meaning well beyond ordinary understanding.  Consider Trial Tr. 3/21/2023 at 113:

Q: And you were one of those supporters who was fed up

16

A: I did not cause any problems while I was there.

Q: I did not ask you if you caused any problems.  I asked you if you were one of the supporters who was fed up, and that's why you went there, right?

A: The comment is about people that were causing problems.

Q:     Right and you are saying there were two groups.  There was one group causing problems and another group that he was fed up.  And you, I am giving you the benefit of the doubt, you were in the group who was fed up right?

A: That's a broad statement, fed up.

Q: Well its your statement.  Are you saying you were in the group that was fed up, or were you in the group that was causing problems?

A: It says there were people there that were fed up.

So I was referring to others that wanted to be heard, yes, maybe as in I don't know.

Q: Well, I am asking you today, right here now, not about others, I'm asking about you. You were one of the people who wanted to be heard, weren't you?

A: I said nothing while in the building, so I don't know how I could be heard.

Q: And so your actions are on January 6, although you might not have said anything in the building, you put your body there right? Id. at 115.

There is nothing Cynthia said here that was lying on the stand. To roll back a little, many people did engage in demonstrative conduct in the Capitol that can be identified beyond silence.

Also, to remember, Cynthia had no idea of the existence of an open door before she saw it. If she had a plan to be heard, she sure did not execute on it by saying anything to anyone.

This goes to the heart of the language differences between the government and the defense. Both Defense Counsel and Cynthia Price, has, over and over, stated that the Prices engaged in no demonstrative conduct while in the Capitol. Video evidence proves just that. No witness testimony disputes that. Neither Lt. Rossi nor Captain Baboulis saw the Prices in the Capitol. Special Agent Belcher only validated the video that shows no demonstrative conduct.

The Government tried two traps here. The government points to an earlier political conversation not under oath, which has Cynthia describing two groups as if that is the universe of people and no other categories can be defined. The term "heard" in this setting. The government is pleased, with this trick because it is a way of asking were you really big guilty or just guilty? I am sure the Government loves games like that. Cynthia's understanding of her conduct is not defined by her casual conversation with a liberal friend trying to emphasize a few points to him. Cynthia properly understood this trap and did not fall for it.

The government counsel insists there is only A and B and Cynthia must choose beween the two. That is not a requirement and Cynthia is correct to articulate distinctions. For example, in the Belcher Affidavit, Special Agent Belcher claim Cynthia said

> **….** that there were different categories of people at the U.S. Capitol and she believed that she and PRICE were on the low-end of the spectrum…. (emphasis added)

Note the phrase categories and not simply two categories. Note the phrase "spectrum".

Putting your "body right there" is not, in Cynthia's opinion, being "heard." Saying something is. The court must accept that people can take positions that are not consistent with

the government's choice of vocabulary or choice of political conversation which is not about the Prices. Such an approach suggests a preconceived notion and not listening to the distinctions. It is not fair to question credibility on that basis and certainly no basis to confirm perjury or materiality.

### C. *Certain Elements of the Court's Understanding Are Based on Unfair Tactics or Assessments Which Inappropriately Influenced the Court's View of Cynthia Prices Credibility*

It is proper that the below issues are not raised as a basis of the USPOs assertions. However, these are issues that pertain to the credibility arguments and were asserted unfairly and in violation of Fourth Amendment Protections.

### 1. *The Government Claimed Cynthia Price Was Sympathetic to A Vile Statement When the Record Which Could Not Be Expected To Be Reviewed From An Over 14,000 Page Exhibit, Which Also Violated The Search Warrant, Shows Exactly the Opposite*

The Defense and Cynthia Price prepared for the exhibits presented by Special Agent Belcher regarding Facebook posts and Facebook messenger as provided in, for example, Gov't Exhibits 300-307. The government should make the Defense aware of substantive exhibits with some particularity in time to prepare. A data dump of 14,637 pages gives no indication of any particular substance. Nor can Cynthia Price be expected to remember specifics from 2 years ago without any attempt to let her and the defense team be prepared. Regardless, the statements from government counsel regarding messages related to Lin Wood statements were simply misleading at trial. The government appeared to argue from part of a Facebook message and tried to portray Cynthia Price as sympathetic to a set of Lin Wood statements that included the term "execute" Mike Pence. Two messages of Cynthia Price show the exact opposite of what the Government got away with at trial. Specifically, in the prior post Cynthia Price states: "....sounds like Lin

Wood is completely lost it."  Gov't Exhibit 308B at p. 3933. In the specific post, Cynthia says "….not sure why he would be doing that to ruin his credibility."  *Id*. Government counsel read language from the post but just omitted the language that clearly indicates Cynthia Price was highlighting that Lin Wood was wrong and Cynthia disagreed with him. Trial Tr. 3/21/2023 at 82.  There was exculpatory information buried in the 14, 637 pages and no expectation of a specific exhibit and approach to argue the opposite.  Defense counsel objected at trial to the questions, saying the defense did not have the article. This clearly meant context was important. The Court overruled and said we have the headline. *Id.* at 82.  This meant the defense had no basis to evaluate completeness.

Moreover, the Court points to these issues in the Court's demerit system for Cynthia Price.  The Court noted "she didn't recall showing articles about Pence" and that she "fudged on the number of people she disseminated her article to."  The Court would not even allow the defense or Cynthia to look at the article and the government did not call out a specific exhibit or present the important related information. Cynthia has sent many facebook messages over time. When a message is presented in a distorted manner and the government then keeps asking for specifics, this not fair.  Government Counsel was clearly trying to portray Ms. Price in a false light.  Government Counsel said Ms. Price posted a comment on Facebook regarding Mike Pence and execution.  Cynthia Price naturally and appropriately said "I would never say anything to that nature."  That is because Cynthia Price knows Cynthia Price and the accusation was over the top.  Cynthia Price continued "I did not say anything about executing anyone."   The government should not have been trying to pull details based on a false narrative.  Here Cynthia was asked without proper context and with prior particular exhibit to the defense to address a single message among thousands and thousands and where the message is over two years old.

Yet the Court assigns demerits to Cynthia.  Separately, with respect to "fudging" as the Court states is Cynthia Price saying she may have sent a video to couple of people but did not know the specific larger number that government counsel may know from searching the vast record. Cynthia said she did not remember the number – which is a true statement and fully understandable.  Cynthia sends statements and forwards posts all the time. It was not a particularly relevant exchange and Cynthia did not know.  Regardless, the Court assigned further demerits to Ms. Price as if this is something Ms. Price should remember cold.  This is not fair or reasonable.

2. **_The Government and the Court Ignored Emojis And Context Which Change the Meaning of Language; Preserving the Full Meaning Was the Basis of Cynthia's Testimony On the Specific Matter the Court Claimed Was About Spelling_**

The prosecution generally tries to take an isolated statement out of the context of the other features related to that statement.  The statements with missing emojis should not have been allowed in.  The Defense objected. Where there were emojis, those facts should always be included and addressed.  Usually, emojis, in this case mean someone is kidding or being light-hearted.  The bottom line is a statement without the emojis is not the statement.  And the prosecution wanted desperately for Cynthia to say something that would not be the subject of further objections.  So, when the Court says Cynthia not admitting to a spelling issue is ridiculous, this statement fails to reflect on the unfair approach the prosecution took.  Cynthia said she was joking. Trial Tr. 3/21/2023 at 117.  Which is consistent with emojis and talking to her friend.  If the government could get Cynthia to say we totally owned it, outside of the context of the missing emojis, which would indicate kidding, then the prosecution would use the statement in isolation.  The Court itself used the phrase stormed the Capitol in its finding without acknowledging the emojis by saying "Ms. Ballenger at 4:51 texted, we stormed the Capitol."

Trial Tr. 3/21/2023 at 169.  This is precisely the problem.  It's like Cynthia Price said, I am kidding only went in for a few minutes, but we stormed the Capitol.  The Court gets rid of the first part and attributes an incomplete and misleading statement to Cynthia Price.

We should further note that Cynthia's statement there are bears in Washington was in response to page of page of transcript that Cynthia wanted to bring bear spray to Washington to attack humans.  Cynthia felt attacked and finally took umbrage.  She did not lie and the statement has nothing to do with credibility.

Finally, the Government and USPO has during trial and elsewhere gotten information, left out critical context, jumped around in time sequences, and just generally been a source of substantial confusion. It is unfair to have a one-sided attack on Cynthia Price that involve issues much smaller than the major confusing, incomplete, and bias information the government seeks to include.

**3.  There was a Violation of Fourth Amendment Rights as A Basis For the Facebook Issues**

Gov't Exhibit 308(B) is 14,673 pages.  It is, basically, the complete data dump from Facebook regarding Cynthia Price's messenger service with Facebook. Gov't Exhibit 308A and 309A are similar, though shorter, data dumps. The Search Warrant in Attachment B has a section III called Government Procedures for Warrant Execution which states:

> The United States Government will conduct a search of the information produced by the PROVIDER and determine which information is within the scope to be seized specified in Section II.  That information that is within the scope of Section II may be copied and retained by the United States.  Law enforcement personnel will then seal any information from the PROVIDER that does not fall within the scope of Section II

and <u>will not further review the information absent an order of the Court</u>. Emphasis
added.

Gov't Exhibits 308A, 308B, and 309A show the government's approach to the Search Warrant is
illegal. These exhibits are covered under Section I of the Search Warrant Affidavit. The entire
Facebook Search Warrant process is a sham and illegal on multiple grounds. The process and
result have been and a full and complete abrogation of Defendant's Fourth Amendment rights.


**VIII.   The Sentencing Criteria Support A Relatively Minimal Sentence**

    ***A.   <u>The Nature of the Offense Conduct, Respect for the Law, a Just a Punishment, Adequate Deterrence and Public Protection All Support a Relatively Minimal Sentence</u>***

The objective is for just and fair sentence pursuant to 18 USC 3553 (a) that is not greater
than necessary to reflect the seriousness of the offense; to promote respect for the law and to
provide just punishment for the offense, to afford adequate deterrence; to protect the public from
further crimes of the defendant. Accomplishing this starts with eliminating excessive constructs
and arguments. This first starts with the specific and limited nature of the offense conduct.  That
conduct is not the event—January 6th.  The Prices understand that January 6th was a substantial
negative event for the Country.  They have no desire to knowingly, physically disrupt any
proceeding.

The Prices entered the Senate Wing door for a minute without any of the police officers
informing them at entrance.  After police informed them, they got in line to exit.  All of this is
discussed extensively above. They never disobeyed an instruction that day and respect law
enforcement.  Prices both have zero points regarding prior criminal conduct. The Prices have

been under court supervision including substantial periods with a probation officer from August 2021 until sentencing.  That is over two years and no violations of the terms.

There should be no punishment for the Prices exercising their Sixth Amendment right to trial.  A trial penalty is inappropriate and illegal.

Cynthia has been working hard, helping her youngest adult child that lives with her. She helps in her husband's small business. Cynthia helps and will further need to help her husband with further cancer treatment and care, including possible side effects.  Again, the letters of support attest to all of this.

The. Prices certainly do not want a repeat of the burdens, cost, and stress caused by this prosecution. The instant case is a very quirky situation. People are not asked to home when they see a police light on a police car.  People are not advised, not to step over 1-foot separations between grass and walkways.  People walk into public buildings daily and expect security measures to be told and addressed inside the door. To the Defense's knowledge before January 6th, we are unaware of a single situation where a party has been arrested, let alone convicted for walking into a public building, unless it also included not following the instruction of a police officer to leave.

What the Defense has recommended is more than sufficient, and more is well beyond unnecessary.

**B.  <u>The History and Characteristics of Cynthia Ballenger (Price) Support A Minimal Sentence</u>**

Cynthia Ballenger (Price) and, formerly, a single mother of 3 who had to take care of her 3 sons with some assistance from her family and very limited assistance from the biological father. Cynthia gave birth to the three children when she was between the ages of 18 to 23 (2000-2004) and living with their biological father, George Hoffman. The couple separated shortly after the birth of the third child, when Joseph Hoffman, the youngest child was 7 months old. In about 2006 Cynthia was awarded full custody of the children.

Cynthia has had to work hard to make ends meet and raise the children. She went to part-time college classes from XX to XX trying to advance herself. At college she had a 3.0 grade point average and covered Xx credits. Cynthia has always had to work hard both trying to earn income and take care of the children. Recently, she has also been a work asset, at times, assisting the print shop business that Chris co-owns.

Cynthia eldest child James Robert Hoffman (age 23) is currently stationed at Fort Campbell in Kentucky and is employed by the US Army. Her middle child, John Douglas Hoffman (age 20) is currently enrolled in school and resides at Missouri Valley University. Her youngest child, Joseph Morrison (age 18) resides with the defendant and her husband and works sometimes at the print shop and at Antrim restaurant where Cynthia works. While, her youngest son, Joey has not been formally diagnosed with a particular condition, Cynthia, some others, believe Joey may need some additional assistance and will likely need to reside at home for some time.

Cynthia began dating Christopher Price in 2007 but did not live with Christopher until the two married in 2017. Both are religious and their relationships to each other and the 3 sons are excellent and important to both.

Cynthia has been employed by the Antrim 1844 Restaurant in Taneytown, Maryland as a server since November of 2022 and works 10-35 hours per week. Cynthia has worked at restaurant jobs from 2016 to the present, in retail from 2014-2015 and as a property manager from 2008 to 2011.   Cynthia had other short-term jobs, such as training horses, on occasion.

Cynthia suffers from migraines as a result of a car accident that occurred in 2020 and takes medication for the symptoms. Cynthia went to physical therapy to aid in her recovery.

Cynthia defendant attended St. John Prospect Hall High School in Fredrick, Maryland for grades 9 and part of 10th grade. The school became unaffordable, so Cynthia transferred to Catoctin High School for the rest of 10th grade through 12th grade. Cynthia did not pass the last semester but and earned her GED in 1998. Cynthia then attended Fredrick Community College in Fredrick, Maryland from approximately 2004 through 2007, but did not earn a diploma given her need to cease her studies to care for her three children.

Cynthia has zero criminal points under the guidelines. Cynthia is a hard-working, productive members of society and the Prices have endeavored to instill such ethos on young men in the family.   One can see from their finances the Prices work hard but overall are in the lower part of the income scales.   While both Chris and Cynthia are resilient, hard workers, damage to the small business Chris is co-owner of at this time would be devastating.   The former cancer treatments for Chris and now new treatments adds to the family stress for the couple.

Mrs. Price is the primary giver and will need to support Chris Price in his treatment and care for his second bout with prostate cancer, to support the small business that Chris and Cynthia depend on, and to support a young adult child still living with the Price.   All that is in the hopeful case of a second set of successful treatment.

26

**C.** **_The Need for Unwarranted Disparities Support the Need for a Minimal Sentences for Christopher and Cynthia Price_**

The discussion of the need for unwarranted disparities is discussed in the main Memorandum in Aid of Sentencing for Christopher Price and incorporated by reference here.

Dated:  September 22, 2023                     Respectfully submitted,

/s/ Nandan Kenkeremath

Nandan Kenkeremath
DC Bar 384732
2707 Fairview Court
Alexandria, Virginia 22311
703-407-9407

*Counsel for Defendants*